v.

**CHRISTIAN CHILD HELP FOUNDATION, Appellee.**

**No. 1588.**

Court of Civil Appeals of Texas, 14th Supreme Judicial District.

March 30, 1977.

Rehearing Denied April 20, 1977.

Ron Etzel, Law Offices, Lloyd Lunsford, South Houston, for appellant.

Susan W. Crump, Butler, Binion, Rice, Cook & Knapp, Houston, for appellee.

Helen A. Cassidy, Houston, for amicus curiae.

CIRE, Justice.

This appeal is from a decree terminating a parent-child relationship.

In October 1974 the child Baby Boy T. was born to H.T. The mother was not married. One week later, H.T. executed an affidavit of relinquishment of parental rights, stating that the child was not the legitimate child of its father, surrendering the care, custody, and control of the child to Christian Child Help Foundation, and designating the Foundation as the managing conservator of the child. She also executed an affidavit of status naming T.D.E. as the father and stating that she had never been married to him or attempted to marry him.

At the end of November 1974 the child was placed with a couple serving as foster parents, with whom the child still lives and who hope to adopt him. In that same month the Foundation brought this suit to terminate the parent-child relationship between the infant and its mother. The Foundation's petition stated that it believed

T.D.E. would waive his rights in and to the child. The Foundation was appointed guardian ad litem and the court set a date for hearing evidence concerning the termination of parental rights and appointment of a managing conservator. However, prior to the hearing, T.D.E. filed a petition for voluntary legitimation of the child. He also sought appointment as the infant's managing conservator. Attached to the petition was a statement admitting paternity of the infant. The Foundation then amended its petition. It contested the legitimation of the child and sought termination of the rights of the father under section 15.-02(1)(E) of the Texas Family Code Annotated (Supp.1976), claiming: that T.D.E. had "engaged in conduct which endangers the physical or emotional well-being of the child" and that termination was in the best interest of the child. On August 10, 1976 the Juvenile Court of Harris County did enter an order declaring the parent-child relationship to exist between appellant and the infant and then proceeded to trial before a jury on the Foundation's suit to terminate the parent-child relationship.

The baby's mother testified as to the circumstances leading up to his birth. In June 1973 H.T. and T.D.E. were employees of the same company when T.D.E., who usually worked elsewhere, was assigned to duty in the building where she worked. T.D.E., who was married and had two children, arranged to be introduced to her at a motel club. They began dating frequently until March 1974, when T.D.E. left his wife and they moved into an apartment together. He did ask her to marry him when he got a divorce. At the end of March he moved out of their apartment without telling her and returned to his wife and children. He later called her and told her that he had been given a promotion and felt it would be bad for his position to be living with someone other than his wife. During part of this period she used no form of contraception because she did not believe that she was able to conceive. She said T.D.E. never inquired whether she used contraceptives. In April 1974 she discovered she was pregnant. She testified she felt abandoned by T.D.E. and ashamed, and that T.D.E. was not interested in the child. She concealed her pregnancy from those at work. On cross-examination she admitted she would not have told T.D.E. she was pregnant had he asked.

T.D.E. testified that H.T. knew from their first meeting that he was married. He testified he told her he loved her. Because he and his wife were not getting along, his wife asked him to leave their home, at which time he moved into the apartment with H.T. He denied telling H.T. that he would marry her. He admitted being afraid that his position at work might be affected by his affair and said his boss had talked to him about the matter. After leaving H.T. he called her to tell her he was returning home, but never called after that. He said the first he knew of the child was in October 1974, when the Foundation contacted him to secure a waiver of his parental rights. He had no idea H.T. might be pregnant and said she had told him she had been using oral contraceptives. Upon being interviewed at the Foundation by a case worker, he admitted having relations with H.T., but was cautious concerning any admission of paternity. He was given a release of parental rights at that time but refused to sign, saying "there's no way that I would ever give one of my children away." He and his wife discussed the possibility of voluntarily relinquishing his rights in the child, and he said his wife felt strongly that he should not do so. He said that he would have offered to help support the child had he known of it. He also said he would give up the child if he felt it was in the child's best interest. His wife did not testify.

Betty Althaus, the Foundation's director of professional services, testified that the baby was born prematurely, was suffering from fetal distress, and that at the time of birth there was some question of his survival. He was in intensive care for a week after birth.

Dr. Robert E. White, a psychiatrist, testified at length on the subject of the child's growing attachment to the "nurturing par-

ents"—those adults who acted as his parents in caring for him—and that separation at 22 months, the baby's age at the time of trial, would cause overwhelming anxiety, which would be traumatic and damaging. He reported on an interview he had conducted with the foster parents and Baby Boy T. and offered the opinion that the child was in a very healthy environment. Using a hypothetical based upon the facts of the case he offered the opinion that a woman in H.T.'s position would feel depressed, rejected, abandoned, anxious, and concerned about her future, that the child would reflect that anxiety, and that the mother might not take proper care of herself, thus causing harm to the fetus. Finally, in relation to the hypothetical, he testified that if the child was taken away from his present environment his emotional well-being would be endangered.

The case was submitted to the jury on two special issues and this instruction:

"In connection with this special issue, you are instructed that you shall not consider whether respondent, T.E., knew or intended that his conduct would endanger the said welfare of the child, Baby Boy T., if there was in fact any such conduct on respondent's part that would endanger such welfare of the said child."

In answer to the first special issue, the jury found that T.D.E. engaged in conduct which endangers the physical or emotional well being of Baby Boy T. In answer to the second issue, the jury found it would be in the best interest of the child to terminate the parental rights of T.D.E.

■ T.D.E. appeals on five points of error. He challenges only the jury's finding in their answer to the first special issue. Points one, two, and three attack the judgment on the grounds that there is no evidence to support the submission of the first special issue to the jury and that there was insufficient evidence to support the jury's affirmative answer to it. We disagree.

Justice Reavley in the case of *In the Interest of K,* 535 S.W.2d 168, 170 (Tex. Sup.), *cert. denied,* 429 U.S. 907, 97 S.Ct. 273, 50 L.Ed.2d 189 (1976) stated:

Sec. 15.02(1) was drafted in 1973 without thought of a biological father who terminated his relationship with the mother and the expected offspring nine months prior to the birth of the child. It may be questioned whether the trial court was restricted to these specific grounds of 15.-02(1) if the father (even if a "parent") were totally unfit to hold any responsibility or control of the child—even though it might not be said that he has yet engaged in conduct which has endangered the child.

Here, however, we have a case where the father has actually engaged in conduct which endangered the "physical or emotional well-being of the child." As shown by the medical testimony, a fetus may suffer from conduct directed at its mother during gestation. There is evidence that damage actually occurred to the child because of the mother's anxious and depressed condition, for which T.D.E.'s conduct was largely responsible. Moreover, T.D.E. now attempts to disrupt the child's life a second time, by taking him from a healthy, loving environment in which he has flourished, a course of action which the testimony established will almost certainly cause anxiety and trauma to the child. These points are overruled.

■ Point of error number four asserts the trial court erred in submitting to the jury the instruction quoted above, for the reason that this instruction allowed the jury to consider the illegitimate status of the child as conduct which endangered the emotional or physical well-being of the child in violation of the equal protection clause of the 14th amendment to the U.S. Constitution. This argument is untenable and the point is overruled. The instruction had nothing to do with the illegitimacy of the child. It was a correct statement of the law. Knowledge or intent on the part of the parent to engage in conduct which would endanger the well-being of the child is not required. *Carter v. Dallas County Child Welfare Unit,* 532 S.W.2d 140, 142 (Tex.Civ.App.—Dallas 1975, no writ). It might have been just as applicable in a case in which a husband leaves his wife whom he

does not know is pregnant as in a case where a man leaves his mistress who carries the illegitimate child of which he is unaware.

The fifth point asserts it was error not to grant appellant's motion for judgment non obstante veredicto because the only evidence which the jury could have considered in answering special issue number one affirmatively was the illegitimate status of the child. As stated above, there was ample evidence of T.D.E.'s harmful conduct to support the jury's answer. This point is overruled.

Affirmed.