**In the Interest of S.H.A., a Child.**

No. 05–85–00692–CV.

Court of Appeals of Texas,
Dallas.

Feb. 27, 1987.
Rehearing Denied April 3, 1987.

Jesse Cuellar, Joseph Rosenfield, Guardian Ad Litem, Dallas, for appellant.

Maridell Templeton, Asst. Dist. Atty., Gary C. Arey, Elizabeth Parmer-Hail, Asst. Dist. Attys., Dallas, for appellee.

SCALES,[1] Justice.

Appellants, A____ A____ and S____ A____ ("the parents") appeal from the trial court's judgment terminating their parental rights to their son ("the child"). The suit was brought by appellee Dallas County Child Welfare Unit of the Texas Department of Human Resources ("Child Welfare"). Based on the jury's answers to special issues, the trial court entered judgment that: (1) each parent had engaged in conduct, or knowingly placed the child with persons who engaged in conduct, which endangered the physical or emotional well-being of the child, and (2) that termination of parental rights would be in the child's best interest. In six points of error, the parents attack the jury's findings, contending that the evidence is legally and factually insufficient. We overrule the parents'

points of error and affirm the judgment of the trial court.

The record reflects that the parents are illegal aliens who came to the United States in 1981. The child, the parents' fourth, was born in the United States on February 12, 1982. The father has been employed, from time to time, working as a construction worker and as a dishwasher at a restaurant. The family's economic situation was characterized by several witnesses as "low-income." At the time of trial in March 1985, the parents had another child. The parents do not speak English, and they testified at trial through an interpreter.

The child's situation was first brought to the attention of Child Welfare in 1983, when the child was approximately sixteen months old. The child had been hospitalized in May 1983 for an ear infection and anemia. The treating physician notified the public health department about the child's condition. Consequently, Barbara Brown, a public health nurse, visited the child's home on May 25, just after the child was released from the hospital. Brown testified that the child was filthy; that he was crying; and that he was eating cookies off of the dirty floor. Brown discussed the child's medication and the need to improve the child's hygiene with the mother. Brown stated that the mother "seemed disinterested in anything I had to say."

After the mother missed a doctor's appointment for the child, Brown made a second visit to the home on June 15. At that time, Brown testified, the child had "pus, very thick, white pus" coming out of his right ear, and he had a burn on his arm that was "pussy and oozing." Brown stated that the child's condition, if left untreated, could be dangerous to the child's health because of the risk of infection. Brown observed that the child appeared to be "very poorly cared for" and that the mother did not pick up the child when he was crying.

After the mother did not keep another appointment for the child at the public

---

1. The Honorable R.T. Scales, Justice, retired, Court of Appeals, Fifth District of Texas at Dal las, sitting by assignment.

health clinic, Brown rescheduled the child's appointment for June 22. Brown performed nutritional, medical, and developmental tests on the child. The child was 28 inches in height and weighed sixteen pounds, eight ounces. This height and weight is below the thirtieth percentile for an average sixteen-month-old infant, and Brown testified that "that is a medical definition for failure to thrive." The statistics indicated that "the child was not growing as a normal child should." The mother told Brown that she fed the child about one-half gallon of milk each day; tortillas; soup once a week; eggs about four times a week; chicken once a week; occasionally fruits and cheese; and soup and beans. Brown stated that this was not a proper diet for an infant. Brown advised the mother that the child should be hospitalized immediately. Brown referred the family to a federally funded program that offers food to infants, and also made a referral to Child Welfare.

As a consequence of Brown's referral, Melba Martinez, an "in-take" worker for Child Welfare, visited the parents' home on June 23. Martinez testified that the child appeared very thin, very weak, and sluggish; his rib cage showed; he had a "protruding stomach or abdomen"; and his face "looked very sad." The older children appeared to be relatively healthy. The mother told Martinez that she fed the child twice a day, and that she fed him "sopas," a mixture of rice and pasta. Martinez expressed concern about the child's health to the mother, but the mother felt that the child was "just naturally thin, as one of her other children had been." Martinez testified that the mother "did not appear to understand that she needed to be concerned." As a result of the home visit, Martinez arranged for food to be provided to the family and to take the child to see a doctor. The next day, June 24, Martinez transported the mother and the child to Children's Medical Center.

The child was hospitalized on June 24 at Parkland Hospital for six days for treatment of the burn on his arm and an ear infection. Part of the diagnosis was that the child was a "failure to thrive" child, and Dr. Paul Prescott was called in as a consultant on the child's case. Dr. Prescott testified that failure to thrive "means a child is not living up to his own growth potential." He said that the "failure to thrive" syndrome is best explained as a "symptom," like a headache or backache; there are "five-hundred and some-odd causes of failure to thrive," including organic, nutritional, and "psychosocial" causes, such as where a mother has failed to nurture the child in some way.

Dr. Prescott stated that once failure to thrive is diagnosed, medical causes are ruled out first. Here, the child's failure to thrive was not due to medical reasons. Dr. Prescott testified that the cause of this child's failure to thrive was malnutrition. Dr. Prescott could not, however, positively exclude the possibility of emotional causes of the child's failure to thrive. The failure to thrive syndrome, in a child of this age, can have long-term effects, such as decreased intelligence, learning disabilities, permanently stunted growth, and increased risk of infection. Prescott testified that it is common for one child in a family of several children to suffer from failure to thrive. He stated that "if there is no medical reason, and it's malnutrition, that's actually more worrisome, because we then start calling it the maternal deprivation syndrome. Then you get into emotional deprivation. And for some reason, this one child is being scapegoated." Dr. Prescott testified that the maternal deprivation syndrome may be based on purely nutritional problems, but that only one child "is neglected, for who knows what reason."

Dr. Prescott stated that his diagnosis of malnutrition as the cause of this child's failure to thrive was in part based on the child's comparative weight gain over three time periods. During the child's May hospitalization, he gained about 1½ to 1¾ ounces in weight each day. During the child's June hospital stay, he gained almost 3 ounces in weight each day. During the thirty-day period between hospital stays, the child gained an average of ¼ ounce in weight per day while he was at home. An

average child of this age gains about ½ ounce per day.

For this reason, Dr. Prescott recommended that the child be placed in foster care when he was discharged from the hospital on June 30. Dr. Prescott testified that he then believed the child's health was in danger.

The child was placed in a foster home upon discharge from the hospital. The foster parent, Molly Green, testified that when the child arrived at her home, he had existing bruises, "bite marks," and sores that looked like cigarette burns on his arm. Green stated that the child needed constant attention; that he became "hysterical" if the Greens were out of his sight; that he did not cry, but screamed, "piercing screams," until he was picked up by Green; and that he was a "tremendously emotional child." The child would not eat voluntarily, and Green testified that this was very unusual for a child of this age. Green stated that she had problems in getting the child to go to sleep, and that this, too, was unusual for a child of this age.

The child was removed from Green's home, after he sustained injuries to his head and face. Green stated that she discovered bruises on the child's chin and neck, and determined that the child was injuring himself in the baby bed by jumping up and down, hitting his head on the railing. Green later learned that the child had never before been in a baby bed. Martinez, the first Child Welfare caseworker, testified that the child was removed from Green's home because he needed constant attention in order to protect him from self-inflicted injuries. The child was placed in a home where he was the only child.

The child was placed in the Richmire home on July 9. Marlene Richmire testified that, in July 1983, the child was lethargic and depressed; he did not respond to pain; and he "didn't have the will to live"—"[h]e was just like an inanimate object." The child would wake from sleep at night every thirty minutes, screaming. Richmire stated that it seemed "that he had repressed anger of something." The child did not want to eat; he was a "very picky" eater; and he occasionally hoarded food, putting it in a napkin and taking it to bed with him. Richmire testified that the child "progressed quickly" while in her care; he became more active, gained weight, and seemed "happy and more secure."

Richmire stated that, when the child was returned to her home after a visit with his parents, he was "really unmanageable." The child woke from sleep at night with "terrible anger." During those visits at which Richmire was present, there was nothing "done to the child" by the mother to cause sleepless nights, "unless it would be very little interaction, ignoring him."

Richmire stated that the child has inordinate fears of loud noises, such as sirens; bugs; and Mexican-American men. "Different times, when we've been out in public, ... a Mexican-American man has approached him, just being nice and kind and trying to talk with him, and he screams." The child does not react in this manner to other men.

Mario Zuniga was assigned to this case in July 1983 as the permanent caseworker for Child Welfare. He testified at trial that his role was to help the family create a safe environment for the child, so that the child could be returned to the family. Zuniga first visited the parents' home after the child had been placed in foster care. Zuniga stated that the house was unsanitary and that he located a better apartment for the family near a day-care center. He arranged for and transported the mother and the other children to doctors' appointments. Zuniga obtained soap for the family; gave them a heater; provided diapers and formula for the baby, and some clothing and toys for the older children. Zuniga stated that the mother, with four small children at home excluding the child in issue, was "very overloaded" and "very, very depressed." Child Welfare arranged for the three older children to be placed in a nearby day-care center operated by Child Care Dallas. Zuniga testified that the older children in the family were being cared for, as far as Child Welfare was concerned, because they were receiving meals at day care.

From June 30 to December 4, 1983, the child remained in foster care. During this time, various workers from Child Welfare and Child Care Dallas worked with the family and offered support services to the family. The agencies arranged for the parents to attend parenting skills classes; the mother went to four out of the five classes, and the father attended one class.

On December 4, 1983, Child Welfare, in accordance with its goal of keeping the child with his natural parents if possible, returned the child to the parents' home. However, the child was removed and placed in foster care again on December 29. Zuniga testified that during this period he visited the parents' home and found the child outside, barefoot, and in dirty diapers, when it was "very cold" weather. Zuniga testified that the child was removed from the parents' home on December 29 after Zuniga found the child injured and the parents absent from the home.

Zuniga testified that he went to the parents' home on December 29 to take the mother and the new baby to a doctor's appointment, as had been pre-arranged with the mother. When he arrived, he found the family car was gone from the driveway, the parents were not there, and the child, with a "real deep gash over his eye," was lying on a bed. The child was "glassy-eyed" and did not respond to Zuniga when he walked into the room. The child had on a dirty diaper. A "young girl," apparently a baby-sitter, was at the home; Zuniga stated that she "appeared to be mentally retarded." The girl told Zuniga: "They want you to take [the child] to the hospital." Zuniga took the new baby to her doctor's appointment and then took the child to Parkland Hospital.

Zuniga's case notes state that the treating physician at Parkland told Zuniga that the injury had occurred at least one day earlier; that the parents should have immediately sought medical treatment; and that it was too late to put stitches in the cut. Zuniga had to hold the child down while the wound was cleaned because the child "became hysterical due to the pain." After medical treatment, Zuniga took the child to the foster parents' home.

The following day, Zuniga met with the mother and father at the Child Welfare Office. Zuniga testified that the father was "very angry" because "it was not that bad of an accident, [and] that we had no business going in there and taking the child out, and that these things happen all the time." Zuniga's report states: "The parents stated that they had not taken [the child] to the hospital since they were out looking for money to borrow to pay for the rent and that [the child] had sustained that injury jumping off a bed." The mother testified at trial that she and the father had gone to look for "money and transportation" to take the child to a doctor.

Also on December 30, the foster parent, Marlene Richmire, took the child to a general practice physician, Dr. Robert Fong. Fong's affidavit states that the child had a one-inch-long cut above his eye that had caused excessive swelling; multiple cuts, bruises, and contusions on his body; and a first-degree burn on his left hand. Fong testified that, in his opinion, the injury was due to "physical, you know, from some blow." Fong also stated, however, that he did not know with one-hundred-percent certainty exactly how the injury was caused. A photograph of the child's face shows the cut and the child's eye swollen shut. In his affidavit, Fong stated: "It is my opinion that [the child's] life could be in danger if he continues to live with his natural parents." Fong testified that he advised Richmire to treat the cut by applying ointments and ice.

Marlene Richmire, the foster parent, testified that after the child's three-week stay with his natural parents, "he had just regressed terribly." At first, the child was "lethargic." "He appeared to us to have lost the will to live again. He just sat and stared. He didn't respond." Once the child got past that, he became a discipline problem. Richmire stated: "He was self-destructive before, but he wasn't the discipline problem that he was when he came back." Richmire testified that the child was aggressive; that he would hit another

child's head against the wall; and that he would spill food or rub it in his own hair. In December 1983, the child was approximately twenty-two months old.

Roxanne Purse, a supervisor for Child Welfare, testified that she was "very alarmed by the regression" of the child after his stay with his natural parents; "when he returned home he regressed so dramatically."

Georgette Speers, a Child Welfare caseworker, has been assigned to this case since June 1984, and she was on the case in March 1985, the time of trial. Speers arranged visits between the child and the natural parents and services to the parents and the other children. She testified that the visits where only the mother is present are "relatively quiet"; when the older siblings are present, however, the visit is "very stressful" for the child. During one visit, the child's older sisters were picking him up, and "they actually started to throw him across the room and throw things at him." Speers had to "extract" the child from the situation; the child was "terrified," and the mother could not control her daughters. Speers testified that she believes "very strongly" that the parental rights should be terminated, because if the child were returned home, he would "suffer profound regression." Speers recommended termination "because of the severely limited capacity of the parents to parent this child."

On January 3, 1984, Child Welfare filed its petition for temporary managing conservatorship over the child. The trial court ordered psychological evaluations of the parents and the child, and Dr. Nadine Palau performed the tests in May.

Dr. Palau testified that the intellectual assessment of the mother and the father indicated they are both in the mentally retarded range (I.Q. tested approximately 65), but this was probably an underestimate due to cultural differences, even though all tests were given in Spanish. Dr. Palau testified that the father's personality tests showed mental confusion; sensitivity to criticism; low frustration tolerance; and a possibility that he may "be given to episodes of explosive behavior," where he reacts "angrily and aggressively." Dr. Palau stated that her impression of the father during her clinical interview with him was that "he was trying hard to say the right things."

During her interview with the mother, Dr. Palau learned that the mother had been a "parental child" in her own family, assuming parenting duties for her siblings, because her mother had a "nervous condition." The mother told Dr. Palau that her mother had committed suicide by setting herself on fire, in front of the mother, about three years previously. The personality tests confirmed that the mother might have a "resistance to wanting to parent as an adult," a product of the parental child experience, and that the mother had difficulty in dealing with the trauma of her mother's death. The tests indicated a very intense anxiety that is internally repressed; a great deal of depression leading to difficulty carrying out every-day activities; and difficulty in being "emotionally available to her children." Dr. Palau testified that the mother had difficulty understanding the seriousness of the child's problems; she thought that the child was only thin.

Based on her observations of the child and his behavioral history, Dr. Palau concluded that the child conformed with battered child syndrome and failure to thrive syndrome. Dr. Palau stated that this child displayed emotional consequences of failure to thrive, such as "not wanting to live and self-destructing." Dr. Palau's written report stated that the child had "special needs for structure," and she explained that in an "unstructured environment, an environment in which he was neglected," the child "could become a very self-destructive child." Dr. Palau testified that "in families such as these, it could be that this one child is what is called the 'identified patient,' or the 'symptom bearer,'" and that this child is being scapegoated; "[w]hether that is happening to other siblings or not does not necessarily mean that that child is safe in that relationship."

Dr. Palau stated that, as of the time she saw the parents and the child, she would

not recommend returning the child to the natural parents. In regard to the family's limited financial resources, Dr. Palau stated that this was a factor in the family's problems in that "financial stress can affect family functioning." Dr. Palau testified that, while the parents may have the intellectual capacity to learn parenting skills, she was "not sure" that they would be able to "follow through" and put into practice what they learned.

Roxanne Purse, the Child Welfare supervisor on this case, was responsible for deciding whether Child Welfare should seek to terminate the parents' parental rights to the child. Purse testified that she decided, after the psychological tests were reported, that the parental rights should be terminated in this case. Child Welfare had been on the case for about nine months at that time. Purse testified that she was concerned "that in spite of all the efforts that had been expended, we seemed to be still at square one, in terms of [the parents'] ability to care for" the child. Purse stated that she strongly believes that the parents do not have the capacity to care for the child, and that the child "cannot survive in that family environment"—if the child were returned, he would "wither emotionally." Zuniga, the Child Welfare caseworker, testified that when he left the case in May 1984, the family still needed "24–hour family services." He stated that, with the various agencies' help, the mother's only responsibilities were to keep the new baby's doctor appointments and to keep the children clean, and that the mother "was not able to do so." He recommended termination of parental rights.

Mary Byrne, a volunteer for a court-appointed agency "Focus," gathered information on the case and also recommended termination. She testified that, in her opinion, if the child were returned, "I don't think he would make it."

At the time of trial in March 1985, the child was approximately three years old, and he was still in foster care at the Richmire home. Richmire testified that, at the time of trial, the child was affectionate, and he hugs and kisses her. She testified that

she did not recommend that the child be returned to his natural parents, even if the testimony during the trial indicated that the parents have "the ability to parent" the child, because the child "has such emotional problems." She stated that the child is "emotionally handicapped." On cross-examination, Richmire stated: "No, sir, I have no degrees, but I have experience."

Dr. Carol Owen testified that she examined the child for his complaints about leg cramps on February 20, 1985, about two weeks before trial. She stated that the child was small for his age, three years, but that he was well-nourished, cheerful and affectionate. Dr. Owen did not find any problem with the child's legs, but she did find that one ear was infected. She stated that ear infections are common for small children and that there was not any pus draining out of the infected ear.

Several Child Care Dallas workers testified on behalf of the parents. They testified that the parents had made significant improvement in their "parenting skills" and that the child should be returned to the natural parents. Nancy Morales, a social worker for Child Care Dallas and manager of the day-care center, testified that the family's problems were largely economic; that the parents were capable of addressing the child's needs; and that "with the proper help, I think the family will do well and can do well." Morales stated that the family's problems were due, in part, to cultural differences. She explained that in Mexico, the "extended family is very important, and the care of the children, if the parents don't do one-hundred percent, there is always a grandmother or godmother or a neighbor, even, who can care for the child." When this family moved to the United States, "they were really isolated," and the responsibility of caring for the children fell totally on the mother.

Morales testified that Zuniga, the Child Welfare caseworker, had told her that Child Welfare would not return the child to the parents after the three-week period in December because the parents "did not make any attempt to seek medical care" for the child after he was hurt. Morales

also testified that she had asked the mother why she didn't take the child to a doctor after he was injured in December 1983; the mother told Morales that she wanted to, but that the father told her no, because "the case worker was coming tomorrow, and he would take care of it."

Morales explained that failure to thrive is caused by malnutrition and that "another factor is dysfunctional relationship between the mother and infant."

Diane Banda, a social worker for Child Care Dallas, had been on this case since April of 1984. She testified that, with proper support services to the family, the child could be returned to his natural parents. She stated that Child Care Dallas could take care of the child during the day and offer services to the family. Banda did not recommend termination of parental rights.

Joan Weiser, the director of social work for Child Care Dallas, testified that there was not enough preparation for the child's return to the parents' home in December 1983. She also stated, however, that the parents had "progressed enough" for the child to return home at that time. Weiser said that Child Care Dallas had been providing support services to the family for about three-and-a-half months prior to December 1983.

Weiser did not recommend termination of parental rights. She testified that the child could enter the day home program offered by Child Care Dallas. Weiser commented that Child Care Dallas has "raised the children of many families" in Dallas and that they "raise other people's children that can't handle them."

Both of the parents testified at trial through an interpreter. The father stated that he would like the child returned "because before I was mean to him, not mean, but I did not have contact with him." He said that his relationship with the child "wasn't normal, because I did badly with him. My facts weren't right with the children." He stated: "Today I am different." The father testified that, while at his home, the child had never put food in his own hair or appeared fearful of Mexican men.

The mother testified that, at the time of trial, she was 25 years old, and she had six children. She stated that the only reason the child was removed from her care was because he had an ear infection and a burn on his arm. The mother said that they did not seek medical attention for the child when he hurt himself in December 1983 because it was at night and "we didn't have transportation."

The mother testified that if the child were returned to her, she would "feed him better food"; "take care of him"; feed him "three time a day"; "feed him on the hour"; and "take him outside to enjoy himself." She stated that she could care for the child "because now we have improved a lot." She said that she learned how to feed and care for the children at the parenting classes which she attended in November 1983, just before the child was returned to her home in December.

Based on this evidence, the jury answered the following special issues:

SPECIAL ISSUE NO. 1

Do you find by clear and convincing evidence that [the mother] knowingly placed or knowingly allowed [the child] to remain in conditions or surroundings which endanger the physical or emotional well-being of [the child]?

ANSWER "We Do" or "We Do Not"

ANSWER:  WE DO NOT

SPECIAL ISSUE NO. 2

Do you find by clear and convincing evidence that [the mother] engaged in conduct or knowingly placed [the child] with persons who engaged in conduct which endangered the physical or emotional well-being of [the child]?

ANSWER "We Do" or "We Do Not"

ANSWER:  WE DO

In regard to Special Issue No. 3, you are instructed that if you have answered either Special Issue No. 1 or No. 2 "We Do", then answer the following Special Issue No. 3; otherwise, do not answer Special Issue No. 3.

SPECIAL ISSUE NO. 3

Do you find by clear and convincing evidence that termination of the rights of

[the mother] is in the best interest of [the child]?

ANSWER "We Do" or "We Do Not"

ANSWER:  WE DO

SPECIAL ISSUE NO. 4

Do you find by clear and convincing evidence that [the father] knowingly placed or knowingly allowed [the child] to remain in conditions or surroundings which endanger the physical or emotional well-being of [the child]?

ANSWER "We Do" or "We Do Not"

ANSWER:  WE DO NOT

SPECIAL ISSUE NO. 5

Do you find by clear and convincing evidence that [the father] engaged in conduct or knowingly placed [the child] with persons who engaged in conduct which endangered the physical or emotional well-being of [the child]?

ANSWER "We Do" or "We Do Not"

ANSWER:  WE DO

In regard to Special Issue No. 6, you are instructed that if you have answered either Special Issue No. 4 or No. 5 "We Do", then answer the following Special Issue No. 6; otherwise, do not answer Special Issue No. 6.

SPECIAL ISSUE NO. 6

Do you find by clear and convincing evidence that termination of the rights of [the father] is in the best interest of [the child]?

ANSWER "We Do" or "We Do Not"

ANSWER:  WE DO

■ These special issues track the statutory language in section 15.02 of the Texas Family Code.  Section 15.02, which provides for the involuntary termination of parental rights, states in pertinent part:

A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

\* \* \* \* \* \*

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; or

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

\* \* \* \* \* \*

and in addition, the court further finds that

(2) termination is in the best interest of the child.

TEX.FAM.CODE ANN. § 15.02 (Vernon Supp.1986).

In order to terminate parental rights under section 15.02, there must be both a finding that the parent has committed one of the enumerated acts under section 15.02(1) and a finding that termination is in the best interest of the child. *Richardson v. Green*, 677 S.W.2d 497, 499 (Tex.1984). Here, the jury answered affirmatively to special issues based on subsection (E) of section 15.02(1) and to issues based on section 15.02(2); the trial court rendered judgment terminating parental rights based on these findings.

In their first and fourth points of error, the parents contend that there was no evidence, or alternatively, insufficient evidence to support the jury's findings that each parent engaged in conduct which endangered the physical or emotional well-being of the child.[2] Relying on *Higgins v. Dallas County Child Welfare Unit*, 544 S.W.2d 745 (Tex.Civ.App.—Dallas 1976, no writ), the parents argue that involuntary termination of parental rights under subsection (E) requires evidence of each parent's "aggressive behavior towards the child" and that the evidence in this case does not reflect physically abusive behavior

**2.** In their brief, the parents bifurcate the jury's findings to special issues numbers two and five, that each parent "engaged in conduct *or* knowingly placed [the child] with persons who engaged in conduct which endangered the physical or emotional well-being of [the child]" (emphasis added).  The parents attack that portion of the findings regarding "knowingly placed [the child] with persons who engaged in conduct" in points of error two and five, discussed below.

by the parents directed towards the child. The parents also contend that the child's physical problems "cannot be directly or indirectly attributed to conduct on the part of [the parents]." We disagree with the parents' contentions and overrule their first and fourth points of error. In so doing, we overrule the *Higgins* decision to the extent that it conflicts with this opinion and, applying section 15.02(1)(E) to the facts of this case, hold that the evidence is both legally and factually sufficient to support the jury's findings that each parent engaged in conduct which endangered the physical or emotional well-being of the child.

We first consider this Court's interpretation of subsection (E) of section 15.02(1) of the Texas Family Code articulated in *Higgins*. In *Higgins*, the jury answered affirmatively to the special issue tracking subsection (D) and answered negatively to the special issue tracking subsection (E), the reverse situation from the jury's answers in this case.

The *Higgins* court, in comparing subsections (D) and (E), stated that subsection (E) "was clearly intended by the legislature to be a provision concerning something more than neglect, namely aggressive behavior toward a child resulting in physical or emotional abuse." *Higgins*, 544 S.W.2d at 749. The court reasoned:

> We believe that this interpretation of the two subdivisions explains the rationale of the legislature in separating the two grounds for termination into two separate subsections. If the legislature had intended for both subsections to cover the same evil, there would be no logical reason for separating them into two distinct grounds. Therefore, we hold that subsection (D) is applicable where the child has been neglected while subsection (E) is applicable where the child is subjected to aggressive conduct by a person causing physical or emotional abuse.

*Id.* The court held that, while the evidence tending to show that the child had been physically abused might have supported a jury finding based on subsection (E), the jury's finding based on subsection (D) "must rest on other evidence." *Id.* at 750.

■ We hold that this Court's interpretation of subsection (E) in *Higgins* is incorrect, and we overrule *Higgins* to the extent that it construes subsection (E) as requiring aggressive or abusive behavior directed towards the child. *See Higgins*, 544 S.W.2d at 749. We so hold for four reasons.

■ First, the *Higgins* interpretation violates the plain language of the statute. Subsection (E) provides for termination of parental rights, where termination is in the best interest of the child, where the parent has "engaged in conduct ... which endangers the physical or emotional well-being of the child." This provision does not require "aggressive behavior," nor does it require that the conduct be directed towards the child. The language of a statute is presumed to have been carefully selected, and every word or phrase is presumed to have been used intentionally, with a meaning and purpose. *Perkins v. State*, 367 S.W.2d 140, 146 (Tex.1963); *Nichols v. William A. Taylor, Inc.*, 662 S.W.2d 396, 399 (Tex.App.—Corpus Christi 1983, no writ). Every word excluded from a statute must be presumed to have been excluded for a particular reason. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981). We cannot insert additional words into a statutory provision, unless it is necessary to give effect to the clear legislative intent. *Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 552 (Tex.1981). Courts may not, however, under the guise of construction, amend a statute by adding words to it, no matter how desirable such additions might seem. *A.M. Servicing Corp. of Dallas v. State*, 380 S.W.2d 747, 748 (Tex.Civ. App.—Dallas 1964, no writ). In short, the courts may not usurp the power of the legislature by reading into a statute language that is not there. *Goldman v. Torres*, 161 Tex. 437, 341 S.W.2d 154, 158 (1960). The *Higgins* interpretation clearly adds language to subsection (E) which is not in the statute as written.

■ Second, subsection (E) contemplates conduct which affects the physical *or* emo-

tional well-being of the child, and termination may be based on emotional endangerment only. Although the *Higgins* opinion states that subsection (E) is applicable where the parent's conduct causes "physical or emotional abuse," 544 S.W.2d at 749, the *Higgins* case narrowly defines "conduct" under subsection (E) as "aggressive behavior toward a child," "aggressive conduct," and "abuse." *Id.* at 749, 750. The rationale in *Higgins* does not account for the possibility of the parent engaging in "conduct" which endangers only the emotional well-being of the child and, although not physically abusive behavior directed towards the child, nevertheless warrants termination of parental rights. Several cases since the *Higgins* decision have upheld termination under subsection (E) where the parental conduct endangered only the emotional well-being of the child. *See e.g., Stuart v. Tarrant County Child Welfare Unit,* 677 S.W.2d 273, 279 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.) (emotional damage to child from witnessing parents' neglect and abuse of younger sister); *Allred v. Harris County Child Welfare Unit,* 615 S.W.2d 803, 806 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) (conduct, abusing mother during pregnancy and violating parole conditions which caused parent to be incarcerated, endangered emotional well-being of child); *Chesser v. Texas Department of Human Resources,* 595 S.W.2d 615, 618–20 (Tex.Civ.App.—Corpus Christi 1980, no writ) (loud, obscene, and abusive language towards third persons endangered child's emotional well-being); *In the Interest of B.J.B. and C.E.B.,* 546 S.W.2d 674, 677 (Tex.Civ.App.—Texarkana 1977, writ ref'd n.r.e.) (fears and anxieties of children evidenced emotional damage due to father murdering mother); *see also In the Interest of S.K.S.,* 648 S.W.2d 402, 404 (Tex.App.—San Antonio 1983, no writ) (murdering child's mother "would constitute the conduct described in sub-paragraph (E)"; termination affirmed on subsection (F)).

Third, the *Higgins* case draws a neglect-abuse distinction between subsections (D) and (E), assigning "neglect" to subsection (D) and "abuse" to subsection (E). The statute does not, however, use the terms "neglect" and "abuse."

Subsection (D), referring to "conditions or surroundings," requires a showing that the child has been placed in an *environment* dangerous to the child's physical or emotional well-being. *Stuart,* 677 S.W.2d at 280; *In the Interest of T.L.H.,* 630 S.W.2d 441, 445–46 (Tex.App.—Corpus Christi 1982, writ dism'd). Thus, subsection (D) refers only to the acceptability of the child's living conditions, *Stuart,* 677 S.W.2d at 280; *T.L.H.,* 630 S.W.2d at 445–46, such as where, for instance, the child is living in a house where there is no electricity or gas, no food, "just a few cockroaches"; or where the child is living with four adult women and twenty-five children in a small, three-room house, and the house is dirty and scattered with decaying food. *See Sanchez v. Texas Department of Human Resources,* 581 S.W.2d 260, 263 (Tex. Civ.App.—Corpus Christi 1979, no writ). *See and compare B–J–M v. Moore,* 582 S.W.2d 619, 620–21 (Tex.Civ.App.—Dallas 1979, no writ) (where parent kept "unsanitary and cluttered apartment," children not properly fed and unable to "walk and talk normally," termination affirmed under subsection (D) because "conditions under which small children are living are dangerous to their physical and emotional well-being"). Subsection (D), therefore, does not concern the *conduct* of the parents, and parental conduct alone is not evidence to support termination under subsection (D). *Stuart,* 677 S.W.2d at 280; *T.L.H.,* 630 S.W.2d at 441.

In *Stuart,* the trial court terminated the parents' parental rights under both subsections (D) and (E). 677 S.W.2d at 276–77. The record showed that, although the parents did not abuse the child, they neglected and abused the child's sister, subjecting her to "systematic inhumane treatment." *Id.* at 279. The Fort Worth Court of Appeals held that there was sufficient evidence to support the first prong of the test for termination, section 15.02(1), under subsection (E), but that there was no evidence to support the trial court's finding of subsection (D). *Id.* at 280. The court stated that

subsection (D) pertains to the child's physical environment.

Thus, subsection (1)(D) refers only to the acceptability of the child's living conditions, and does not concern the conduct of the parents toward the child. In the case at bar, there is *no evidence that Jeremy's physical living conditions were at all unsanitary*. We hold, therefore, that the trial court erred in finding that the Stuarts knowingly placed or allowed Jeremy to live in conditions or surroundings which endangered him.

*Id.* (emphasis added) (citation omitted).

■ We perceive the distinction between subsections (D) and (E) to be the *cause* of the resulting danger to the child's physical or emotional well-being. Under subsection (D), it must be the environment which causes the child's physical or emotional well-being to be endangered, as distinguished from the parent's conduct. Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's acts but also by the parent's omissions or failures to act.

In the instant case, there is some evidence in the record that the child's living conditions were not ideal. There is no evidence, however, that these "conditions or surroundings" *caused* the child's physical or emotional well-being to be endangered. Rather, the record shows that the danger to this child's physical and emotional well-being has been *caused* by the parents' conduct toward the child. Thus, we reject the neglect-abuse distinction between subsections (D) and (E) drawn by the *Higgins* opinion.

Finally, since *Higgins*, other courts of appeals have addressed situations where the parent's "conduct" was neither knowingly subjecting the child to a harmful physical environment under subsection (D), nor physically abusing the child, as *Higgins* defined subsection (E); these types of "conduct," however, were held to endanger the physical or emotional well-being of the child, and thus warranted termination. For instance, murdering the child's other parent has been held to be "conduct" sufficient to warrant termination under subsection (E). *In the Interest of S.K.S.*, 648 S.W.2d at 404; *In the Interest of B.J.B. and C.E.B.*, 546 S.W.2d at 677. Similarly, violent acts directed towards the child's sibling constitute "conduct" under subsection (E), *Clark v. Clark*, 705 S.W.2d 218 (Tex.App.—Dallas 1985, writ dism'd w.o.j.); *Stuart*, 677 S.W.2d at 279, as does evidence of bizarre parental conduct. *Navarette v. Texas Department of Human Resources*, 669 S.W.2d 849, 850–51 (Tex.App.—El Paso 1984, no writ). Moreover, "conduct" under subsection (E) may be supported by evidence of behavior which results in gross neglect of the child. *In re L.F.*, 617 S.W.2d 335, 337–40 (Tex.Civ.App.—Amarillo 1981, no writ); *Melton v. Dallas County Child Welfare Unit*, 602 S.W.2d 119, 121 (Tex. Civ.App.—Dallas 1980, no writ); *D.F. v. State*, 525 S.W.2d 933, 940 (Tex.Civ.App.— Houston [1st Dist.] 1975, writ ref'd n.r.e.).

For the foregoing reasons, we reject the *Higgins* definition of "conduct" in subsection (E).[3] We interpret subsection (E) to require exactly what it says: that the parent engaged in conduct which endangers the child's physical or emotional well-being. Thus, we hold that subsection (E) does not require physical abuse directed toward the child. *In the Interest of C.D.*, 664 S.W.2d 851, 853 (Tex.App.—Fort Worth 1984, no writ); *In the Interest of S.K.S.*, 648 S.W.2d 402, 404 (Tex.App.—San Antonio 1983, no writ); *Wray v. Lenderman*, 640 S.W.2d 68, 71 (Tex.App.—Tyler 1982, no writ); *In re L.F.*, 617 S.W.2d 335, 340 (Tex.Civ.App.— Amarillo 1981, no writ); *Allred v. Harris County Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.); *In the Interest of T.D.E.*, 550 S.W.2d 101 (Tex.Civ.App.— Houston [14th Dist.] 1977, writ ref'd n.r.e.); *In the Interest of B.J.B. and C.E.B.*, 546 S.W.2d 674, 677 (Tex.Civ.App.—Texarkana 1977, writ ref'd n.r.e.). Therefore, we over-

---

**3.** We note that two of our prior decisions call the *Higgins* holding into doubt without citation to that case. *Clark v. Clark*, 705 S.W.2d 218 (Tex.App.—Dallas 1985, writ dism'd w.o.j.); *Melton v. Dallas County Child Welfare Unit*, 602 S.W.2d 119 (Tex.Civ.App.—Dallas 1980, no writ).

rule *Higgins* to the extent it conflicts with this opinion.

■ Having established the correct interpretation of the statutory language to be applied, we turn to the standard of review which we must observe in reviewing the record in this case. The natural right existing between parent and child is of constitutional dimension, and, consequently, involuntary termination proceedings must be strictly scrutinized. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985); *In the Interest of G.M.,* 596 S.W.2d 846 (Tex. 1980). For these reasons, the Texas Supreme Court has held that the evidence in support of the jury findings must be "clear and convincing" before a court may render judgment for involuntary termination. *Holick,* 685 S.W.2d at 20; *Richardson v. Green,* 677 S.W.2d at 499. The "clear and convincing" standard of proof is defined as an intermediate standard which requires "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In the Interest G.M.,* 596 S.W.2d at 847, quoting *State v. Addington,* 588 S.W.2d 569 (Tex.).

With these principles in mind, we believe the evidence in this case supports the jury's findings that the parents engaged in conduct which endangered the child's physical and emotional well-being. In considering an attack on the legal sufficiency of the evidence, we consider only the evidence and inferences which support the finding, and we disregard all evidence and inferences to the contrary. *Richardson,* 677 S.W.2d at 501; *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). In considering an attack on the factual sufficiency of the evidence, we must consider all of the evidence to ascertain if the evidence is so weak that it could not produce a firm belief or conviction in the mind of the trier of facts that the challenged finding is true. *In re L.F.,* 617 S.W.2d 335, 340 (Tex.Civ.App.—Amarillo 1981, no writ); *see In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ The evidence in this case which supports the jury's findings reflects parental conduct which endangered the child's physical and emotional well-being. First, the parents did not give the child enough food or did not properly feed the child. There is little direct evidence as to what foods were fed to the child on a daily basis. The mother told one worker that she fed the child "sopas" twice a day; she told another worker that she regularly fed the child milk, tortillas, soup, and beans, and occasionally fed him soup, eggs, chicken, fruit, and cheese. There is, however, ample circumstantial evidence which shows that the parents did not provide the child with enough food or nutritionally adequate food, and circumstantial evidence may be sufficient to prove the grounds for termination under section 15.02. *Smith v. McLin,* 632 S.W.2d 390, 392 (Tex.App.— Austin 1982, writ ref'd n.r.e.); *Higgins,* 544 S.W.2d at 750.

Melba Martinez testified that, in June 1983, the child appeared very thin, weak, and sluggish and that his abdomen protruded and his rib cage showed. Dr. Prescott testified that the child gained significantly in body weight while in the hospital in May and June 1983, and that the child's weight gain between hospital visits, while in his parents' custody, averaged about one-half of that which the typical child of that age gains in weight per day. The child's failure to thrive syndrome was diagnosed after the child had been within the care and control of the parents. This is circumstantial evidence of the parents' conduct, namely failure to properly feed the child.

The record reflects that this conduct endangered both the physical and emotional well-being of the child. Dr. Prescott stated that the cause of this child's failure to thrive was malnutrition. The testimony at trial, we think, fully developed the seriousness of the failure to thrive syndrome and its physical and emotional ramifications. In June 1983, the child was very thin, lethargic, and not of normal physical development for a sixteen-month-old child. The physical dangers of failure to thrive include increased susceptibility to infections as well as such long-term effects as learning

disabilities, stunted growth, and decreased intelligence.

The parents' conduct which resulted in the child's failure to thrive also endangered the emotional well-being of the child. The testimony reflects that the failure to thrive disorder may have severe, permanent emotional consequences, and Dr. Palau, the psychologist, testified that this child displayed emotional problems consistent with failure to thrive syndrome. There is ample evidence in the record that this child has emotional problems, manifested in self-destructive tendencies, unusual aggressiveness towards other children, and behavioral problems. Marlene Richmire's testimony that the child occasionally hides food from the dinner table in his napkin and takes it to bed with him is strong evidence of an emotional problem which can be inferentially linked to the parents' conduct. Further, the testimony indicates that the child's physical and emotional health improved while he was in the custody of the foster parents in the late summer and fall of 1983; after his three-week stay with his parents in December, however, the child had "regressed dramatically."

Second, the parents engaged in conduct which endangered the physical well-being of the child in that they did not seek appropriate medical treatment for the child. The record is replete with testimony that the mother missed doctors' appointments for the child on several occasions. The public health nurse testified that when she visited the family on June 15, 1983, the child had "very thick, white pus" draining from one ear, and a burn on one arm that the nurse feared would become infected if left untreated. The burn on the child's arm had indeed become infected by June 24, when the child was hospitalized. There is evidence which reflects that early ear infections, if left untreated, could be dangerous to the child's health.

Moreover, after the child was injured in December 1983, the parents did not take the child to the doctor immediately after the injury or the next day. There is testimony from which the jury may have inferred that, instead of learning to take the child to the doctor when he was ill or injured, the parents had come to rely on the social workers to take care of the child's injuries.

Thus, we hold that there is some evidence to support the jury's findings in special issues numbers two and five that the parents engaged in conduct which endangered the child's physical and emotional well-being. The record reflects that the parents did not properly feed the child and did not seek appropriate medical treatment for the child. This is conduct which, the evidence shows, endangered the child's physical and emotional well-being.

We next consider the evidence to the contrary, and whether the evidence as a whole is factually sufficient to support the jury's findings to issues two and five.

First, the parents argue that the child's failure to thrive cannot be causally linked to any "conduct" on the part of the parents. They point to testimony by both foster parents that the child was a "picky eater" and would not eat voluntarily. In their brief, the parents argue that this evidence shows that "the problem was the child's eating habits" and that "it was inherent on the part of the child not to eat." Ms. Martinez, a Child Welfare worker, testified that the parents were not intentionally neglecting the child nor purposefully denying the child food. She stated that there was no "overt act or conduct" by the parents which caused the child to develop failure to thrive syndrome. Although this evidence conflicts with the jury's findings it was the jury's prerogative to weigh the conflicting evidence and to judge the credibility of the witnesses.

In addition, as we have stated, it is not necessary that the parent "knowingly or intentionally" engage in conduct in order to support a jury finding based on subsection (E). Moreover, there is circumstantial evidence, outlined above, which shows that the child developed failure to thrive symptoms while in the parents' care. The jurors, relying on their experience and common knowledge, were free to infer that a sixteen-month-old child could not feed himself and that the child's malnourished con-

dition, therefore, was a result of the parents' conduct.

The parents also point to evidence that the child's various physical problems, other than the failure to thrive symptoms, were not attributable to the parents' conduct. Dr. Owen stated that ear infections are common for small children, and the child had an ear infection on February 20, 1985, at a time when he had been in foster care for over one-and-a-half years. There was testimony that the child's arm was burned when the mother, while holding the child, had a cooking accident, and that the injury to the child's face and eye, sustained during his three-week stay with his natural parents in December 1983, was accidental; the child hurt himself when he was playing and fell off the bed.

Molly Green, the first foster parent, testified that, while in her care, the child hurt himself by jumping up and down in the baby bed and by jumping out of the high chair. Zuniga, a Child Welfare caseworker, stated that the child was "energetic" and "accident-prone."

■ We agree that the overwhelming weight of the evidence reflects that the child's ear infections, burns, bruises, scrapes, and cuts were not inflicted upon the child by the parents and were not the result of mistreatment. Other than Dr. Fong, all the witnesses agreed that these problems were not the result of mistreatment. Georgette Speers, a Child Welfare caseworker, testified: "There is no evidence of active abuse" of the child. The evidence tending to show that the parents did not cause these problems is not, however, evidence tending to show that the parents appropriately cared for the child's injuries or sought professional medical treatment for the child when necessary.

The jury could distinguish between the injuries and common ailments of childhood on the one hand, and the parents' failure to appropriately care for the child's injuries after they occurred on the other; several witnesses also pointed out this distinction at trial. We conclude that the evidence showing that the parents did not cause these problems does not meet, and therefore does not rebut, the evidence reflecting that the parents endangered the physical well-being of the child by not seeking appropriate medical treatment for the child.

In summary, we hold that the evidence is sufficient to support the jury's findings that the parents engaged in conduct which endangered the child's physical and emotional well-being. The parents' first and fourth points of error are overruled.

In their second and fifth points of error, the parents contend that there is no evidence, or alternatively, insufficient evidence to support the jury's findings that the parents knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child.

■ Special issues numbers two and five ask whether each parent "engaged in conduct *or* knowingly placed the child with persons who engaged in conduct" which endangered the child's physical or emotional well-being (emphasis added). The issues, which track the statutory language, are framed in the disjunctive; thus, evidence sufficient to support *either* the parent's own conduct or the conduct of others with whom the parent knowingly placed the child, is evidence sufficient to support the jury's affirmative answers. Because we have held that there was sufficient evidence in the record to support the jury's findings that each parent engaged in conduct which endangered the physical or emotional well-being of the child, the jury's findings on special issues numbers two and five are adequately supported by the evidence. Points of error numbers two and five are overruled.

In their third and sixth points of error, the parents attack the jury's answers to special issues numbers three and six which find that it would be in the child's best interest to terminate the parental rights of each parent. The parents first contend that the trial court erred, as a matter of law, in entering judgment based on these findings because "any lack of ability [on the part of the parents] to provide a desirable degree of care [for the child] was due

to [the parents'] lack of education, training, and misfortune." The parents also contend that there was insufficient evidence to support these findings. We disagree.

Special issues numbers three and six track the statutory language of section 15.-02(2) of the Texas Family Code. The factors to be considered in ascertaining the best interest of the child include, but are not limited to:

(A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (footnotes omitted). We note that, in this case, the trial court listed these factors in the jury instructions.

In their third point of error, the parents contend that there is no evidence to support these findings because any lack of desirable care for the child was excused by the parents' lack of education, training, and misfortune, relying on *In the Matter of R.E.W.*, 545 S.W.2d 573 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.) and *D__ F__ v. State*, 525 S.W.2d 933. This admonition was first articulated by the Houston Court of Appeals in *D__ F__ v. State*:

We do not suggest that the courts should terminate the parent-child relationship when the parent through lack of intelligence or training, illness, or misfortune is unable to provide a desirable degree of physical care and support for his or her children. Where love and affection exist between a parent and child some lack of material comforts is not, in

our opinion, detrimental to the child's well-being. . . .

525 S.W.2d at 940. The court continued from this statement, however, to conclude: "[B]ut a lack of adequate love and affection may be evidenced by the parent's deliberate neglect in failing to provide a reasonable measure of care and comfort for the child." *Id.* The court affirmed the trial court's judgment terminating the parental rights pursuant to subsection (E). *Id.* at 939, 940.

In *In the Matter of R.E.W.*, the Houston court rephrased the *D__ F__* admonishment: "However, the harsh and irrevocable remedy of termination is not justified where the evidence shows that a parent's failure to provide a desirable degree of care and support for the child is due *solely* to lack of intelligence, training, or misfortune." *In the Matter of R.E.W.*, 545 S.W.2d at 582 (emphasis added). *See Navarette*, 669 S.W.2d at 851 (mother's inability to care for her children was "not due solely to her misfortune, illness or diminished mental ability").

At the outset, we note that, although the parents' brief appears to treat it as such, "lack of education, training, or misfortune" is not an affirmative defense which, if properly pled and proved, would negate all evidence tending to show that termination is in the best interest of the child. Rather, the parents' lack of education, training, and misfortune is only one of several factors to be considered by the trier of fact in determining whether termination is in the child's best interest. In *In the Interest of Sneed*, 592 S.W.2d 430 (Tex. Civ.App.—Fort Worth 1979, no writ), the court held that a finding that the parents' "lack of care of the child was not through malice or carelessness, but through ignorance" does not negate findings that the parents "engaged in conduct and allowed the child to remain in conditions . . . which endangered the physical and emotional well-being of the child." *Id.* at 431. We hold that "lack of education, training, or misfortune" falls within the final category of factors enumerated in *Holley*, excuses for the acts or omissions of the parent, and

thus is one factor to be considered by the trier of fact in determining the best interest of the child.

In reviewing the record, we treat the parents' third point of error as a "no evidence" point, because the parents' brief urges us to review the evidence most favorable to Child Welfare, which is the standard of review applicable to a no-evidence point of error. Accordingly, we consider only the evidence and inferences tending to support the jury's findings and disregard all evidence and inferences to the contrary. *Richardson,* 677 S.W.2d at 501; *Garza,* 395 S.W.2d at 823.

█ The record reflects that Child Welfare and Child Care Dallas offered extensive services and training to the parents over a period of months which did not have a significant impact on the parents' ability to care for the child. The Child Welfare supervisor testified that in spite of all the efforts to assist the parents, "we seemed to be still at square one, in terms of [the parents'] ability" to care for the child. The Child Welfare caseworker testified that the family still needed "24–hour family services" in May 1984. A Child Care Dallas social worker testified that the parents did not seek medical treatment for the child after he was injured in December 1983 because they believed that the Child Welfare worker "would take care of it." Several witnesses testified that they believed the emotional needs of the child exceeded the parents' ability to care for and nurture the child; the foster parent stated that the child needs constant attention and a great deal of attention.

Dr. Palau stated that, as of the time she saw the parents and the child, she would not recommend returning the child to the natural parents. Dr. Palau further testified that, while the parents may have the intellectual capacity to learn parenting skills, she was "not sure" that they would be able to "follow through" and put into practice what they learned.

Roxanne Purse, the Child Welfare supervisor on the case, testified that the parental rights should be terminated in this case. Purse stated that she strongly believes that the parents do not have the capacity to care for the child, and that the child "cannot survive in that family environment"—if the child were returned, he would "wither emotionally."

Mary Byrne, a volunteer for a court-appointed agency, "Focus," gathered information on the case and also recommended termination. She testified that, in her opinion, if the child were returned, "I don't think he would make it."

Richmire, the foster parent, testified that she did not recommend that the child be returned to his natural parents because the child "has such emotional problems." She stated that the child is "emotionally handicapped." Child Welfare witnesses testified that the child would be put up for adoption if the parental rights were terminated and that the child would be "adoptable."

Dr. Prescott testified that there was a possibility of "maternal deprivation syndrome" in this family, where one of several children is being emotionally deprived and "scapegoated." The psychologist, Dr. Palau, echoed that the child may be the "symptom bearer" who is being used as a scapegoat. This testimony reflects the possibility of an emotional cause, other than lack of education, training, and misfortune, of the parents' conduct and the resulting failure to thrive symptoms displayed by the child. *See D__ F__ v. State,* 525 S.W.2d at 940 ("the trial court was entitled to accept the psychologist's opinion testimony suggesting that the appellant wwants to keep her baby to get back at her parents, to use as a symbol of personal accomplishment, and as a means of providing a feeling of love to herself").

Several Child Welfare caseworkers testified that they believed termination of parental rights would be in the child's best interest. Two physicians who examined the child testified that the child should not be returned to the parents because his health would be seriously jeopardized.

We conclude that the foregoing evidence is some evidence to support the jury's findings that termination as to each parent is in

the best interest of the child. The parents' third point of error is overruled.

In reviewing the record under the sixth point of error, we must consider all of the evidence to ascertain if the evidence is so weak that it could not produce a firm belief or conviction in the mind of the trier of facts that the challenged finding is true. *In re L.F.*, 617 S.W.2d at 340; *see In re King's Estate*, 244 S.W.2d at 661.

The parents point to testimony in the record that tended to show that the parents' inability to care for the child was due to their ignorance and lack of training and education. It is undisputed that the parents are a "low-income" family; that the parents have low mental abilities; and that they are struggling to overcome the many cultural differences which confront them in the United States. The parents and several Child Care Dallas workers testified that the parents had improved their parenting skills and that the parents were capable of taking care of the child in the future. The parents testified that they had learned what kinds of food to feed the child and how to care for and nurture the child.

There was also testimony, however, which indicates that, even with the extensive support services offered to the family by Child Welfare and Child Care Dallas, the parents did not improve the quality of care for the child. The record shows that the child was returned to the parents in December 1983, after Child Welfare had been involved for three to four months. During December, the Child Welfare caseworker found the child in diapers outside the house in cold weather; the child was removed when he was found injured and the parents had not taken appropriate action in treating his injuries nor taken him to the doctor. This testimony indicates that the social programs to assist the parents in caring for the child were made available to the parents and that these programs were not capable of significantly affecting the parents' ability to care for the child.

In weighing the evidence, the jury was not required to find that the parent is "unfit" in order to find that termination is in the best interest of the child. *In re R__ D__ P__*, 526 S.W.2d 135, 137 (Tex.Civ. App.—Dallas 1975, no writ). Nor was the jury required to accept the truth or accuracy of the parents' explanations for past actions and statements as to future intentions. *Smith v. McLin*, 632 S.W.2d at 392; *Melton*, 602 S.W.2d at 121. Here, there was ample evidence that Child Welfare offered extensive services designed to preserve the family unit and to avoid a termination suit. And, although the record reflects that the parents' inability to adequately care for the child was due in part to the parents' lack of education, training, and misfortune, there is sufficient evidence from which the jury could conclude that the child's problems were not due *solely* to these factors and could conclude that this was not an appropriate situation in which to leave the child with his parents, and that termination would be in the child's best interest.

We hold that the evidence was sufficient to support the jury findings that termination of parental rights would be in the best interest of the child. The sixth point of error is overruled.

■ Finally, we fully recognize that because fundamental constitutional rights are involved, severance of the parent-child relationship will survive constitutional scrutiny only if: the asserted governmental interest is compelling; a particularized showing is made that the state interest is promoted by terminating the relationship; it is impossible to achieve the goal through any less restrictive means; and procedural due process protections are met. Each of these requirements, however, has been satisfied in the present case.

First, the parents were represented by an attorney both at trial and on appeal and that a guardian ad litem was appointed to represent the child's interest. The parents were afforded a jury trial and they do not contend that they were in any way denied procedural due process. Accordingly, the question is whether the three remaining factors have been met.

■ The governmental interest at stake here is the protection of the physical and emotional safety and well-being of the child and the provision of a stable, permanent home for him. Clearly, protecting the lives, and promoting the stability of the lives, of its citizens are legitimate concerns of the government and are compelling interests.

■ Next, several witnesses testified that unless the child was removed from his parents' home, the child "wouldn't make it." Testimony of this nature satisfied the requirement that a particularized showing be made that protecting the life and well-being of the child would be promoted by termination.

■ Finally, it would be impossible to promote the goals of providing for the physical and emotional safety of the child and providing for a stable, permanent home for the child through a means less drastic than termination of the parents' rights. A *permanent* home for the child can be obtained only through adoption and the child cannot be adopted unless the parents' rights are terminated. The less drastic alternatives available to the state, such as day care or foster homes, cannot achieve the state's goal of providing a safe, stable, and *permanent* home for the child. To hold otherwise puts the state to a cruel choice: abolish all programs designed to temporarily assist families such as that in the present case so that no less drastic alternative is ever available, or, keep the temporary programs, thus ensuring that a less drastic alternative to termination is available but, in doing so, also ensuring that children such as the one in the present case will never obtain a safe, *permanent* home. We hold that the constitutional safeguards have been met.

The judgment of the trial court is affirmed.

GUITTARD, C.J., and STEPHENS, STEWART, ROWE, HECHT, LAGARDE and McCRAW, JJ., join in this opinion.

McCLUNG, J., files a dissenting opinion in which DEVANY, WHITHAM, HOWELL, BAKER and THOMAS, JJ., join.

DEVANY, J., files a dissenting opinion in which HOWELL, McCLUNG and BAKER, JJ., join.

McCLUNG, Justice, dissenting.

While agreeing with the able dissent of Justice Devany, because there are additional reasons why the majority opinion is erroneous, I file this dissent to explain these reasons.

It is well settled that involuntary termination of parental rights involves fundamental constitutional rights. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *In re G.M.*, 596 S.W.2d 846, 846 (Tex.1980).

Because fundamental constitutional rights are involved, the evidence in support of termination must be clear and convincing before a court may involuntarily terminate parental rights. *Santosky*, 455 U.S. at 769, 102 S.Ct. at 1403; *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). Clear and convincing evidence means "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979); *Wetzel v. Wetzel*, 715 S.W.2d 387, 389 (Tex. App.—Dallas 1986, no writ). Under this standard of proof, the scope of appellate review is expanded and the appellate court has more discretion in determining whether there was sufficient evidence to support the fact found by the trial court. *Hellman v. Kincy*, 632 S.W.2d 216, 218 (Tex.App.— Fort Worth 1982, no writ) (citing FAMILY LAW — *Standard of Proof —"Clear and Convincing Evidence" Standard of Proof Will Be Required in all Proceedings for Involuntary Termination of the Parent-Child Relationship*, 12 St. Mary's L.J. 558, 565 (1980).

In order to terminate parental rights there must be a finding of specific conduct

under section 15.02 *and* a finding that termination is in the best interest of the child. *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984); *Wiley v. Spratley,* 543 S.W.2d 349, 351 (Tex.1976). Both of these requirements must be proven by clear and convincing evidence independently of each other. *Boyd v. Texas Department of Human Services,* 715 S.W.2d 711, 712 (Tex.App.—Austin 1986, writ granted). The mere fact that one of these requirements has been proven is *no evidence* by which the State can inferentially prove up the remaining requirement. *Cf. Wiley,* 543 S.W.2d at 351; *Boyd,* 715 S.W.2d at 713; *Compasano v. State,* 576 S.W.2d 100, 103 (Tex.App.—Houston [1st Dist.] 1978, no writ). There is a strong presumption that a child's best interest will be served by maintaining the parent-child relationship. *In re G.M.,* 596 S.W.2d at 847.

The jury found that the parents had not knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well being of the child. However, the jury found that the parents had engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well being of the child, and also found that termination was in the best interest of the child.

I conclude that the evidence is insufficient to support either of the affirmative findings. Having set out the relevant law concerning involuntary termination cases and mindful of the expanded scope of review[1] required in such cases I shall now review the sufficiency of the evidence in this case.

### INVOLUNTARY TERMINATION

The evidence before the jury to support the State's contention that the parents engaged in conduct which endangered the physical or emotional well-being of the child was the following (1) the child was undernourished and (2) the parents did not immediately take the child to the hospital for treatment of a gash over his eye.

These parents have five children. The older three were examined and found not to be malnourished. These children are all in school and in day care *provided by Child Welfare.* Indeed, as pointed out by the majority, a social worker for Child Welfare testified that the other children were being adequately cared for *because* they were receiving meals at day care. Child Care Dallas, a United Way agency, offered to enroll this child in their special programs with his brothers and sisters but Child Welfare refused, opting instead to pursue termination of the parents' rights. The youngest child, born after the time that this child was removed from the home, is also adequately nourished. This is due to the parents' improved financial condition and parenting skills.

While in the parents' home, this child was fed a diet consisting primarily of dairy and cheese products as well as a dish called "sopas," described as "like rice, pastas, baked with spices." This diet was said to be nutritionally inadequate for the child both for the inadequacy of the portions and the lack of meat and vegetable items. The parents were getting free milk, dairy and cereal products from the "WIC" program. Consequently, the child's diet consisted heavily of milk and dairy products. The only form of assistance the family was receiving in the way of food was free milk, cheese and cereal. It naturally follows that the child's diet was heavy on milk and dairy products. As the parents were not receiving free meat and vegetable products, likewise, the child was not being fed a diet replete with meat and vegetables. The parents were not American citizens so the family was unable to get government assistance in the form of welfare benefits, food stamps and medical care paid for by the federal government.

The inadequacy of the meal portions was caused by the family's poverty. The lack of nutritionally balanced meals was also

---

1. Our scope of review, while expanded, is not as expansive as it could be. *See State v. Duran,* 204 Neb. 546, 283 N.W.2d 382, 385 (1979) and the cases cited therein. ("An appeal of this matter is heard by the appellate court *trial de novo* upon the record.")

caused by poverty as well as the ignorance of the parents in the proper proportion of food groups to be fed to an infant of that age. The pediatrician that examined, tested, and followed the child's progress in the hospital stated conclusively that any failure of the child to meet his optimum growth potential was solely the result of malnutrition. Further, he excluded physical or emotional abuse by the parents and the home environment along some 500 other possible causes, stating, "In that particular child, it was 100–percent nutrition." In this regard, the record reflects that the other children were as thin as this child at his age. It is also interesting to note the child's nutritional state did not originally so concern Child Welfare that they thought termination was needed. Child Welfare originally returned the child to the home even after he was found to be undernourished. This child's nutritional woes were exacerbated by his eating habits. One foster parent testified that the child refused to eat during his stay with her family and that she, therefore, had to forcefeed him. This behavior was consistent with the parents' testimony of their difficulty in getting the child to eat.

As stated earlier, the child was malnourished because of the poverty and ignorance of the parents. Termination is not justified where the evidence shows that a parent's failure to provide a desirable degree of care and support of the child is due to lack of intelligence, training, or misfortune. *In re R.E.W.*, 545 S.W.2d 573, 582 (Tex.Civ. App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.); *D.F. v. State*, 525 S.W.2d 933, 940 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.); *see also Clark v. Dearen*, 715 S.W.2d 364, 367 (Tex.App.—Houston [1st Dist.] 1986, no writ). The parents fall into this category by having the misfortune of possessing insufficient funds to purchase adequate food for their children. The majority's response is to summarily dismiss the statement in these cases as *mere dicta.* However, as even the majority concedes, the natural right existing between parent and child is of constitutional dimension. *Holick*, 685 S.W.2d at 20. This natural parental right has been character-

ized by the United States Supreme Court as "essential," "a basic civil right" and "far more precious than property rights." *See Stanley*, 405 U.S. at 651, 92 S.Ct. at 1212, and the cases cited therein. This right is protected from infringement by the State in the due process and equal protection clauses of the Fourteenth Amendment as well as the Ninth Amendment. *Id.* Therefore, the majority's holding that parental rights may be terminated because of a situation resulting from a parent's impoverished condition contravenes established constitutional law. This is so because it has been constantly held that it is impermissible to infringe upon *fundamental constitutional rights* on the basis of individual wealth. *Boddie v. Connecticut,* 401 U.S. 371, 385, 91 S.Ct. 780, 790, 28 L.Ed.2d 113 (1971) (Douglas, J., concurring); *Harper v. Virginia State Board of Elections,* 383 U.S. 663, 668, 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169 (1966); *Douglas v. California,* 372 U.S. 353, 355–57, 83 S.Ct. 814, 815–817, 9 L.Ed.2d 811 (1963); *Griffin v. Illinois,* 351 U.S. 12, 16–18, 76 S.Ct. 585, 589–590, 100 L.Ed. 891 (1956); J. Nowak, R. Rotunda and J. Young, *Constitutional Law,* 731 (1983). Let me emphasize that I do not base my belief that terminating parental rights on the basis of poverty is impermissible because of "dicta" in two state intermediate appellate court opinions but rather upon settled constitutional law as declared by the United States Supreme Court. If the words of *D.F., In re R.E.W.* and *Clark v. Dearen* be "dicta" they are "dicta" mandated by basic principles of constitutional law. Furthermore, any interpretation of section 15.02 of the Family Code that would allow parental rights to be terminated because of poverty would I believe make section 15.02 of the Code fundamentally unfair and, *a causa de cy,* unconstitutional. *See Santosky,* 455 U.S. at 753–54, 102 S.Ct. at 1394–1395.

An examination of the only remaining basis on which termination was sought finds it to be lacking as well. The child was again removed from the home and termination proceedings brought when the child was discovered by a social worker to

be suffering from a gash over his eye. The babysitter in the home at that time told the social worker that the parents wanted the social worker to take the child to the hospital. The parents testified that they did not take the child to the hospital because they were out looking for money to buy food and they knew that the social worker was coming by the next day and he could take the child to the doctor. The social worker further testified that the injury was an accident resulting from the active nature of the child, and that the parents had tried to reach him about the accident when it happened at 8:30 p.m. the evening before his scheduled visit but that he was unavailable. There was no evidence that this wound was life-threatening, or that the one-day delay was an impediment to treatment. Indeed, there was no evidence that this delay had any ill effects at all on the child.

It must be remembered that these parents are undocumented aliens from Mexico, unable to speak English. There was evidence that test scores show them to be mentally retarded. The parents are uneducated, ill-trained, and scared of deportation. The record shows that the social workers assigned to this family performed many tasks for them. The workers found them a place to live, brought food and appliances they needed, and generally tended to their needs. It would seem quite natural for these parents to grow dependent upon this individual. When this child needed medical attention the parents quite naturally looked to their "guardian and provider" for help. While these workers' substantial efforts to assist the family in whatever way possible are to be applauded and encouraged, it is cruel and unfair to allow these parents to become dependent on the Child Welfare Department and then have the department use acts of the parents caused by this dependency as a basis for terminating their parental rights.

The majority takes the evidence that the jury found to have exonerated the parents under section 15.02(1)(D) and uses it to support the jury's finding under section 15.02(1)(E). That is, the majority is holding that *unknowing neglect* of the child

caused by ignorance and poverty is sufficient to support termination under 15.-02(1)(E). This is not only contrary to our decision in *Higgins v. Dallas County Child Welfare Unit*, 544 S.W.2d 745 (Tex.Civ. App.—Dallas 1976, no writ), but it is also inconsistent with the accepted definitions of neglect used in the overwhelming majority of cases dealing with the parent-child relationship.

"Neglect" has been defined as a disregard of duty resulting from *indifference* or *wilfulness*. *In re Masters*, 165 Ohio St. 503, 137 N.E.2d 752, 755 (1956); *Matter of Betty C.*, 632 P.2d 412, 414 (Okla.1981); *In re Sweet*, 317 P.2d 231, 235 (Okla.1957). It has also been defined as "the *intentional, deliberate* and *unjustifiable* failure to perform a duty with which the parent is charged by law according to acceptable community standards." *C.S. v. Smith*, 483 S.W.2d 790, 794 (Mo.Ct.App.1972).

"Neglected child" has been defined as a child who is abandoned or who lacks proper parental care by reason of the *fault* or *habits* of the parent. *In re Kinkner*, 191 Neb. 367, 216 N.W.2d 165, 167 (1974); *Caruso v. Superior Court In and For Pima County*, 2 Ariz.App. 134, 406 P.2d 852, 856 (1965); *but see In re Vikse*, 147 Mont. 417, 413 P.2d 876, 877 (1966).

"Child Neglect" has been defined as *wilfully* failing to provide proper and sufficient food, clothing, maintenance or a failure to do or permit any act necessary for a child's well being. *State v. Burden*, 126 N.J.Super. 424, 315 A.2d 43, 44 (App.Div. 1974).

The common thread running through all of these definitions is the requirement of affirmative and deliberate action on the part of the parent. In other words, a culpable mental state is required before neglect can justify termination.

A particularly cogent case discussing culpability is *In re Jack H.*, 106 Cal.App.3d 257, 165 Cal.Rptr. 646, 652 (1980) where it was held:

Neither *financial inability* to provide *necessities* nor a less than ideal home environment are of themselves coexten-

sive with the *culpable neglect* necessary to sever all familial ties.... [I]nterference with the fundamental liberty of a child to be raised by his or her parents cannot constitutionally be countenanced by a mere showing of neglect. To permit intervention for mere neglect would be to permit the state to interfere with impunity in the affairs of any family. [Emphasis added.]

Therefore, I do not believe that acts which this jury found to be committed unknowingly and out of ignorance under section 15.02(1)(D) can also constitute that conduct contemplated by section 15.02(1)(E) to support termination. To permit intervention for mere neglect would be to permit the state to interfere with impunity in the affairs of any family. The majority's holding that exonerating evidence to a charge under 15.02(1)(D) can constitute damning evidence under 15.02(1)(E) not only flies in the face of established principles of law but also strains credulity. That portion of *Higgins* which analyzes subsections (D) and (E) of the Family Code and says that subsection (D) of the Family Code requires *knowing neglect* of the child and that subsection (E) requires *aggressive conduct* or, at least, affirmative conduct by a person which endangers the physical or emotional well-being of the child is sound and should not be overruled. If subsection (E) is not interpreted as requiring some affirmative conduct, as distinguished from passive neglect, then subsection (E) includes all the "conduct" described in subsection (D) but without the requirement of "knowingly," so that the jury's finding here that the parents' conduct did not violate subsection (D) becomes meaningless. This interpretation not only harmonizes the imprecise wording of the statute but also is in harmony with the accepted definition of neglect used in cases dealing with the overwhelming majority of cases dealing with the parent-child relationship. *See In re Kinkner*, 216 N.W.2d at 167; *In re Masters*, 137 N.E.2d at 755; *Matter of Betty C.*, 632 P.2d at 414; *In re Vilas*, 475 P.2d at 617; *In re Sweet*, 317 P.2d at 235; *Caruso v. Superior Court In and For Pima County*, 406 P.2d at 856; *In re Jack H.*, 165 Cal.

Rptr. at 652; *C.S. v. Smith*, 483 S.W.2d at 794; *State v. Burden*, 315 A.2d at 44. *But see In re Vikse*, 413 P.2d at 877. Sound case law should not be ignored.

In our case the verdict establishes that the only neglect alleged or shown was committed unknowingly and the evidence shows that no *aggressive conduct* by the parents occurred. Therefore, we do not even need to reach the question of whether "aggressive conduct" must be directed at the child. I believe the majority is without legal foundation to support its holding that unknowing neglect can constitute the culpable neglect required to support termination. I do not believe that this type of "neglect" constitutes that term of art used in termination cases or that it can ever constitute "conduct" under section 15.-02(1)(E) of the Family Code.

In addition, it is undisputed that any neglect of the child was solely due to lack of education, ignorance, fear and poverty. I strongly concur in the statement in *D.F.* and *In re R.E.W.* that termination is not appropriate when a parent "through lack of intelligence or training, illness or misfortune is unable to provide a desirable degree of physical care and support for his or her children." To interpret the Family Code to allow termination for conduct caused by ignorance, lack of training, illness or misfortune would, I believe, render the Family Code constitutionally infirm as violative of the due process clause. *Cf. Ex parte Ramzy*, 424 S.W.2d 220, 223 (Tex.1968); *In re Anderson*, 604 S.W.2d 338, 339–40 (Tex. Civ.App.—Tyler 1980, no writ); *Heilman v. Wolke*, 427 F.Supp. 730, 732 (E.D.Wis. 1977). I would hold the evidence legally insufficient to support the affirmative finding regarding the conduct of the parents.

## BEST INTEREST

Having examined the evidence and law dealing with the first part of section 15.02 I shall now turn to the question of whether the evidence was sufficient to support the jury's finding that termination was in the best interest of the child.

When making a determination of whether termination is in the best interest of the

child, the fact finder may consider a number of factors, including, but not limited to: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to the individuals seeking custody; (F) the programs available to assist in promoting the best interest of the child; (G) the plans for the child by the individuals or agencies seeking custody; (H) the stability of the home or proposed placement; (I) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (J) any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976). Applying the *Holley* factors, it is apparent that it has not been shown by clear and convincing evidence that termination is in the best interest of the child. The child is too young to express his desires. The emotional and physical needs of the child now and in the future would best be served by staying with his natural parents, if possible. The evidence shows that the parents have worked hard to improve their parenting skills and can now more adequately care for the child. The emotional and physical danger to the child now and in the future is slight. There is no evidence that either parent ever physically abused the child. There is also no evidence that the parents knowingly emotionally abused the child. There is no evidence that the parents use drugs or intoxicants of any kind. There is no evidence that either parent uses profane, obscene, or objectionable language at home or in the presence of their children. Furthermore, the parents now have a greater realization that this child is a "special needs" child and are prepared to give him more attention. As to the cluster of factors dealing with the persons seeking custody, it is noteworthy that Child Welfare said that this child is "adoptable" and they are planning to place him with an American family. While it is true that this child was "Born in the U.S.A." his heritage and culture are Hispanic. To tear asunder

the parent-child bond would also entail separating him from his brothers, sisters, grand-parents, etc. This would destroy the extended family bond that is especially important. It cannot be said that it is in this child's best interest to be torn apart from not only his parents but his other relatives that love him, and be placed with strangers.

There were and are programs available to assist in promoting the best interest of this child that did not encompass termination. A representative of Child Care Dallas testified that they could and would assist these parents in caring for this child and in seeing that he is fed and educated. Child Welfare had workers who were helping this family with the care of this child. Improvement was being made. There was no evidence improvement could not have continued to be made and the child protected without having to terminate these parents' rights.

Certainly it is true that the Family Code does not require the State to seek less drastic alternatives before filing suit for termination of parental rights. It is no doubt true that Child Welfare has a right to *file* suit for termination without seeking less drastic alternatives as indeed anyone can file suit against anyone else for whatever reason he or she chooses. I vehemently disagree, however, that a parent's rights can be *terminated* without a showing that less drastic means are unavailable.

The constitution recognizes as *fundamental* the right of family integrity. *Santosky,* 455 U.S. at 753, 102 S.Ct. at 1394; *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974); *Stanley,* 405 U.S. at 651, 92 S.Ct. at 1212; *May v. Anderson,* 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed.2d 1221 (1953); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); *Franz v. United*

*States,* 707 F.2d 582, 603 (D.C.Cir.1983); *Roe v. Conn,* 417 F.Supp. 769 (M.D.Ala. 1976); *Alsager v. District Court of Polk County, Iowa,* 406 F.Supp. 10, 15 (S.D. Iowa 1975), *aff'd,* 545 F.2d 1137 (8th Cir. 1976); *In re Sherol A.S.,* 581 P.2d 884, 888 (Okla.1978); *Holick,* 685 S.W.2d at 20; *Wetzel,* 715 S.W.2d at 388-89.

"What gift has providence bestowed on man that is so dear to him as his children?"

The majority acknowledges that involuntary termination of parental rights involves fundamental constitutional rights but inexplicably fails to grasp the significance of this fact. Because involuntary termination involves fundamental constitutional rights, severance of the parent-child relationship will survive constitutional scrutiny only if the following requirements are met: (a) the asserted governmental interest must be *compelling;* (b) there must be a particularized showing that the state interest in question would be promoted by terminating the relationship; (c) it *must be impossible to achieve the goal in question through any means less restrictive of the rights of parent and child* and (d) the affected parties must be accorded the procedural protections mandated by the due process clauses. *Franz,* 707 F.2d at 602. *See also Roe,* 417 F.Supp. at 779; *Alsager,* 406 F.Supp. at 21-22, 24; *D.S. v. Dept. of Public Assistance and Social Services,* 607 P.2d 911, 922 (Wyo.1980).

The majority summarily dismisses the mandate of these requirements in this case with the cavalier statement that the State has a compelling interest in providing a stable and permanent home for the child through termination, regardless of the less restrictive alternatives shown by testimony. In effect, granting a license for the State to totally disregard those fundamental constitutional rights of the parents whenever the State so chooses. This departure of long established constitutional principles through judicial legislative decree is astounding, to say the least.

There was testimony that Child Care Dallas was willing and able to assist this family in supplying the needed care for the child. Additional evidence was also introduced showing alternatives other than termination to protect this child. I believe that any interpretation of the Family Code interpreting "best interest of the child" to allow termination of the parent-child relationship when any viable alternatives are shown would render section 15.02 of the Family Code unconstitutional. *See Franz v. United States, supra; Roe v. Conn, supra; D.S. v. Dept. of Public Assistance and Social Services, supra.*

The acts or omissions of the parents indicating that the existing parent-child relationship is not a proper one and the excuses for these are set out elsewhere in this opinion and do not require repeating. What does require repeating is that it has simply not been shown by clear and convincing evidence that termination is in this child's best interest. After examining and applying relevant case law the only conclusion reachable is, again, that termination was not justified.

## ANALOGOUS CASES

An even stronger case for termination was presented in *In re R.E.W.,* in which an involuntary termination suit was brought against the mother under section 15.-02(1)(D) and (E) of the Family Code. The testimony established that the child remained in the custody of the mother until the child was eighteen months old. At that time the mother sought treatment for her alcoholism. The child was placed in foster care and returned to the mother four months later. The mother and child being poverty-stricken, lived in squalor in a small, dilapidated rent house in a high crime area. The mother kept filthy turpentine-soaked rags in the home. Edible food was left in the kitchen and was covered with fungus and roaches. The child was small, frail, and malnourished. She was behind in her development and unable to walk. The child was not fed solid foods, but was kept on a bottle for the mother's convenience. The child constantly had a bottom that was scalded. The mother did not change her diaper with regularity and the child's buttocks were raw and oozing. The mother kept a loaded gun and medicine bottles

within reach of the child. The mother was receiving psychiatric care and at one point was hospitalized in the Austin State Hospital. During this time Child Welfare assumed care and custody of the child. Large open sores were observed on the child. The child had emotional problems in that she was very aggressive toward others, hyperactive and would deliberately inflict injury upon herself. While there was improvement when the child was in foster care the child would regress when returned to the mother. The mother had a ninth-grade education and was living on welfare and food stamps. She had been an alcoholic since the age of sixteen but no longer drank. There was testimony that she had made progress in "straightening out her life." She was responsive to therapy and there was testimony she would continue to improve and that at time of trial she could take better care of her child.

The court of appeals held that while it was painfully apparent that the mother failed to meet minimal standards as a parent this was the result of her basic lack of understanding of her parental responsibilities and of her emotional and physical disabilities. The court further stated that the evidence showed the mother was making an effort to conform with the requirements of the Child Welfare Unit, and that with the assistance of certain social agencies some progress was being made.

The court stated that termination is not justified if a parent's failure to provide care and support is due to lack of intelligence, training, or misfortune. After an examination and analysis of the law in termination proceedings, the court held that under the facts and circumstances described above, it was not shown that the requirements of 15.02(1)(D) and (E) of the Family Code had been met or that termination was in the best interest of the child. It is particularly interesting to note that at this time the Family Code only required the court's findings in termination cases be based upon a preponderance of the evidence under rules generally applicable to civil cases. Now, of course, clear and convincing evidence is required. The majority cites *In re R.E.W.*, but fails to grasp its precedential value to our case. The facts in *In re R.E.W.* and our case concerning the child are strikingly similar but significantly more severe in *In re R.E.W.* The acts done by the mother were much more serious then those done by the parents in our case yet the court held that termination was not justified. This holding was reviewed and upheld by our supreme court.

A similar case in which evidence was held insufficient for termination under section 15.02(1)(D) and (E) is *In re R.L.*, 620 S.W.2d 249 (Tex.Civ.App.—Amarillo 1981, no writ). The testimony at trial revealed that the child was inappropriately dressed, kept in filthy, substandard housing that was either too hot or too cold, fed improperly, and bruised. During times that the mother was in jail, the child was left with her husband who was an alcoholic. A caseworker also noticed that the child's babysitter allowed the child to lie in bed with no side supports and picked up the child without providing proper support for the child's head and back. The child was also diagnosed as having marasmus, which is a starvation syndrome. Faced with these facts and circumstances the court held that the State had not met its onerous burden of proving by clear and convincing evidence that the requirements of section 15.02(1)(D) or (E) had been met or that termination was in the best interest of the child. Again, the acts of the mother were substantially more egregious then in our case and again are held not to be sufficient to support termination.

## CONCLUSION

It is undisputed that these parents are not "ideal." They are poverty-stricken, ignorant, uneducated, ill-trained in child-rearing and are of limited intelligence.

It is also apparent that the child has emotional problems and requires special attention. But surely the majority would not and is not advocating that the parental rights of all parents who have autistic children, hyperactive children, or children with any other handicap that requires special attention be terminated because the par-

ents may be ill-equipped to handle these problems. These parents love their child very much, so much so that they willingly increased their risk of deportation in order to regain their son. The testimony at trial was sharply divided with one-half of the social workers who testified stating that they would not recommend termination. It is significant to note that the guardian ad litem appointed to protect the best interest of the child also refused to recommend termination. The social workers who did recommend termination did so because "The parents had limited parental ability", "the child needs special attention" "the parents are overwhelmed with too many other kids" and other reasons of equally questionable validity. These parents had made improvement and there were agencies willing to assist them so that additional improvement could be made. It is apparent that there was a period of crisis that occurred within this family at the period this child was removed from the home. The parents were in severe financial difficulty and were unprepared to parent a "special needs" child. Since that time they have worked hard to improve and have improved their parenting skills. Their financial condition has also improved. Consequently, their youngest child is not "failing to thrive" and their other children are doing well. There is no indication that this child would not also do well if he were returned to the home. Any rational examination of the facts could only lead to the conclusion that the State has not met their onerous burden of showing by clear and convincing evidence that section 15.02(1)(E) has been met or that termination is in the best interest of the child.

It is not the purpose of the Family Code of this state to prescribe just how often a child should be scrubbed, or exactly what diet should be slavishly adhered to and it by no means follows that a child's welfare is always necessarily promoted by removing him from a home of poverty and hard work, and transplanting him in another home of luxury and ease. Within the writer's knowledge, a generation of vigorous men and women have grown up under conditions that would not likely meet the approval of this majority.

The observations and musings of the Supreme Court of North Dakota in *In re Kelber*, 51 N.D. 698, 200 N.W. 786 (N.D. 1924) seem especially appropriate to this case. These words are even more necessary to read and understand today than when it was written in 1924:

> The parents may not be blessed with intelligence of the highest order, nor with a high degree of education or culture. The law, however, makes no distinction between the genius and the common man, the educated and the ignorant, the refined and the uncouth, the rich and the poor, in so far as the natural right to the custody of offspring is concerned. Every consideration of justice and humanity requires that family ties shall not be lightly sundered ... The home and the family, held together by the ties of natural, rather than adoptive, affection, is the last bulwark of American institutions. Poverty, lack of education or of culture alone, are never sufficient justification for severing the ties that bind families together. In this western country, on these western plains, many a home might have been broken where large families were raised by the pioneers in one room cabins of logs or sod, had poverty, lack or education, or begrimed faces of children, playing on naked mother earth, been the only showing required.

For the multitude of reasons stated above, I dissent.

DEVANY, WHITHAM, HOWELL, BAKER and THOMAS, JJ., join in this opinion.

DEVANY, Justice, dissenting.

I respectfully dissent.

The majority has held that passive, unknowing, neglect may constitute "conduct" sufficient to terminate parental rights under section 15.02(1)(E) of the Texas Family Code. The majority has instantly antiquated section 15.02(1)(D) and its attendant requirement that neglect be committed "knowingly" in order to justify termi-

nation. The majority has replaced it with an all-encompassing subsection (E), which has no "knowingly" requirement. In the process, the majority has overruled case law from this court which coherently avoided interpreting the requirements of subsection (D) into oblivion.

The jury answered the pertinent special issues as follows:

Do you find by clear and convincing evidence that [the parents] knowingly placed or knowingly allowed the child ... to remain in conditions or surroundings which endanger the physical or emotional well-being of the child? Answer[:] <u>We Do Not</u>.

Do you find by clear and convincing evidence that [the parents] engaged in conduct or knowingly placed the child ... with persons who engaged in conduct which endangered the physical or emotional well-being of the child? Answer[:] <u>We Do</u>.

Hence, the jury refused to find that the parents "knowingly allowed the child to remain in conditions or surroundings" endangering the child's physical or emotional well-being. There is no evidence that the parents engaged in *affirmative* actions which could have endangered the physical or emotional well-being of the child. Consequently, in order to reconcile the jury's answers to the special issues and have an answer supported by the evidence, I must conclude that the jury found that the parents' *conduct* which endangered the physical or emotional well-being of the child was to *unknowingly* allow the child to remain in conditions or surroundings which endangered his physical or emotional well-being—i.e., that they neglected the child due to their ignorance.

If this was a proper basis for termination, why did the legislature specifically reuire in subsection (D) that neglect be committed knowingly in order to form the basis for termination? Why, under the majority's analysis, will termination ever be sought under subsection (D) when the "knowingly" requirement may be sidestepped by proceeding under subsection (E)?

I have another, even more fundamental disagreement with the majority's approach. Termination of parental rights is a complete, final, and irrevocable act, divesting for all time a parent and child of all legal rights, privileges, duties, and powers with respect to each other save the child's right to inherit. *Wetzel v. Wetzel*, 715 S.W.2d 387, 391 (Tex.App.—Dallas 1986, no writ).

The natural right existing between parents and their children is of constitutional dimensions, and, therefore, involuntary termination of parental rights involves fundamental constitutional rights. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1976); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985); *Wetzel*, at 388. Consequently, termination is not, and should not be, appropriate when a parent, "through lack of intelligence or training, illness or misfortune is unable to provide a desirable degree of physical care and support for his or her children." *D__ F__ v. State*, 525 S.W.2d 933, 940 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ). *See also Sanchez v. Texas Department of Human Resources*, 581 S.W.2d 260, 264–65 (Tex.Civ.App.—Corpus Christi 1979, no writ); *In the Matter of R__ E__ W__*, 545 S.W.2d 573, 582 (Tex. Civ.App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.). Again, because there was no evidence of abusive conduct, and because the jury declined to find that the parents *knowingly* neglected their child, the conclusion is inescapable that the parents' rights were terminated in the trial court because of their unknowing, ignorant neglect of their child.

I recognize that portions of *Higgins v. Dallas County Child Welfare Unit*, 544 S.W.2d 745 (Tex.Civ.App.—Dallas 1976, no writ), have not withstood the test of time. I agree that the dictum in *Higgins* that states, in order to support termination, that the parents' abusive conduct must be directed *at* the child, has properly been rejected, *sub silencio*, by this court. *See Clark v. Clark*, 705 S.W.2d 218 (Tex.App. —Dallas 1985, writ dism'd w.o.j.) (violent acts directed towards the child's sibling constitute "conduct" under subsection (E)).

I emphatically disagree with the majority, however, which overrules the sound conclusion in *Higgins* that passive neglect does not constitute "conduct" under subsection (E). I fear that the majority has now inappropriately opened the door for termination of parental rights based solely upon the ignorant, unknowing neglect of the child by his parents.

I believe it extremely significant that in *Higgins* the jury found that the parents "had *knowingly allowed their son* ... to remain in conditions and surroundings which endangered his physical well-being." *Higgins*, 544 S.W.2d at 746 (emphasis added). In the instant case the jury found that *neither parent knowingly* allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child. Thus, we have a fact situation presented where poor, ignorant, parents *did not knowingly* neglect their child, yet the majority tells us that ignorance or inability in caring for a child is tantamount to a course of "conduct" to justify *termination* under the language of section 15.02(1)(E). For example, when we are faced with an economic depression and parents *cannot* provide adequate food for their children, under the majority holding, termination will be justified. The majority has *enacted law* that in a time of poverty *parental rights will be terminated.* The majority will have the state become a "big brother" form of government of such supremacy that it can destroy the very base of freedom and democracy in this country by destroying the family. "Termination involves fundamental constitutional rights that require that statutes authorizing involuntary termination be *strictly construed* in favor of the parent." *Clark v. Dearen,* 715 S.W.2d 364, 368 (Tex.App.—Houston [1st Dist.] 1986, no writ) (emphasis in original).

Our case is unique because a jury has found *no mala in se* in the obvious neglect and undernourishment of the child in this case. Yet the majority has seized upon the helplessness of the underprivileged to not only take away their child, but to forever terminate their rights. To excuse the majority in its shortsightedness by using the cliché "hard facts make poor law," is being too kind.

One must look beyond the hard facts of this case and foresee the ultimate consequences of what the majority has done to our society: for example, parental rights will be terminated based upon (1) poverty; (2) ignorance; (3) poor judgment; or (4) a standard of family conduct not acceptable by a government agency.

It is one thing to deliberately abuse a child, but it is quite another to be too poor or too ignorant to meet the standards of modern medical technology or the prevailing attitude of a state social service agency. I will further point out that the legislature has provided an adequate remedy where the best interests of the child are concerned in section 14.01 of the Texas Family Code where a managing conservator may be appointed in circumstances such as these to protect the child without termination of parental rights.

I would hold that the judgment of the trial court should be reversed and judgment rendered for the parents of S.H.A.

McCLUNG, HOWELL and BAKER, JJ., join in this opinion.