In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-09-00036-CR


______________________________




RUSTY BOB BEENE, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 6th Judicial District Court


Lamar County, Texas


Trial Court No. 22341




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 Rusty Bob Beene appeals from the revocation of his community supervision, on his pleas of
"true" to the State's allegations contained in its motion to revoke, for the underlying offense of
burglary of a building. See Tex. Penal Code Ann. § 30.02 (Vernon 2003). Beene was sentenced
by the trial court to twenty-four months' confinement in a state jail facility and a fine of $500.00. (1) 
See Tex. Penal Code Ann. § 12.35 (Vernon Supp. 2009). Beene was represented at trial by a
different, appointed, counsel than the one on appeal. 

 Beene's attorney has filed a brief which discusses the record and reviews the proceedings. 
Counsel has thus provided a professional evaluation of the record demonstrating why, in effect, there
are no arguable grounds to be advanced. This meets the requirements of Anders v. California, 386
U.S. 738 (1967); Stafford v. State, 813 S.W.2d 503 (Tex. Crim. App. 1991); and High v. State, 573
S.W.2d 807 (Tex. Crim. App. [Panel Op.] 1978).

 Counsel mailed a copy of the brief to Beene August 3, 2009, informing Beene of his right
to examine the entire appellate record and to file a pro se response. Counsel simultaneously filed
a motion with this Court seeking to withdraw as counsel in this appeal. Beene has neither filed a
pro se response, nor has he requested an extension of time in which to file such a response.

 We have determined that this appeal is wholly frivolous. We have independently reviewed
the clerk's record and the reporter's record, and we agree that no arguable issues support an appeal. 
See Bledsoe v. State, 178 S.W.3d 824, 826-27 (Tex. Crim. App. 2005). In a frivolous appeal
situation, we are to determine whether the appeal is without merit and is frivolous, and if so, the
appeal must be dismissed or affirmed. See Anders, 386 U.S. 738.

 We affirm the judgment of the trial court. (2)





 Jack Carter

 Justice


Date Submitted: October 14, 2009

Date Decided: October 15, 2009


Do Not Publish
1. Beene appeals three companion appeals, cause numbers 06-09-00035-CR, 06-09-00036-CR
and 06-09-00037-CR, all decided this date, from the revocations of his community supervision of
the offenses of forgery of a financial instrument, burglary of a building, and theft of property. The
sentences are to run concurrently. 
2. Since we agree this case presents no reversible error, we also, in accordance with Anders,
grant counsel's request to withdraw from further representation of Beene in this case. No substitute
counsel will be appointed. Should Beene wish to seek further review of this case by the Texas Court
of Criminal Appeals, Beene must either retain an attorney to file a petition for discretionary review
or Beene must file a pro se petition for discretionary review. Any petition for discretionary review
must be filed within thirty days from the date of either this opinion or the last timely motion for
rehearing that was overruled by this Court. See Tex. R. App. P. 68.2. Any petition for discretionary
review must be filed with this Court, after which it will be forwarded to the Texas Court of Criminal
Appeals along with the rest of the filings in this case. See Tex. R. App. P. 68.3. Any petition for
discretionary review should comply with the requirements of Rule 68.4 of the Texas Rules of
Appellate Procedure. See Tex. R. App. P. 68.4.



CPS investigation, the Kenyons admitted they abused drugs and needed
assistance. Ronald Hamilton, a CPS investigator, testified he found little evidence to substantiate
some of the allegations, but he did determine that Mrs. Kenyon allowed the children to run around
the house unsupervised while she slept. (1)
 Further, Debra Funtez, the court-appointed special
advocate, also investigated the Kenyon family and determined they were in "great turmoil" because
of the parents' drug abuse. Funtez recommended termination of Mrs. Kenyon's parental rights,
opining that she was unable to care for the children and likely would not be able to do so in the
foreseeable future. Funtez also noted that N. K. suffered from various insecurities, feelings of
abandonment, and night terrors.

 The Kenyons subsequently agreed to a service plan, (2) but CPS received two additional
referrals in early January. First, Z. K. apparently did not return to school until a few days after the
Christmas break. Second, the Kenyons left the children with a sitter for over twenty-four hours
without sufficient food or water, while purportedly attending a job interview. At this point, CPS
representatives picked up the children and placed N. K. and D. T. K. with their paternal grandmother. 
On January 8, four days after first leaving the children with their grandmother, the Kenyons visited
the CPS office and admitted they had not been on a job interview, but rather on a "drug binge." N.
K. and D. T. K. were ultimately placed in foster care. Mrs. Kenyon was unable to make satisfactory
progress on her service plan because her community supervision for a criminal conviction was
revoked in May 2000, and she was sentenced to ten years in prison. (3) 

 In March 1995, Mrs. Kenyon was sentenced to ten years' confinement, probated, for engaging
in organized criminal activity in connection with her burglary of a habitation. Sometime during 1997
or 1998, she tested positive for marihuana and cocaine, at which time the State moved to revoke her
community supervision. Mrs. Kenyon's community supervision was subsequently modified to
require her placement at a Substance Abuse Felony Punishment Facility (SAFPF). She completed
the first phase of the drug treatment program at the SAFPF, but failed to complete the second phase
at the Salvation Army treatment center in Dallas. (4) She was terminated from the program for leaving
the facility without permission. This conduct led to the revocation of her community supervision
and the reinstatement of her ten-year prison sentence.

 Before placing N. K. and D. T. K. in foster care, CPS representatives investigated the
possible placement of the children with their maternal grandmother, Sheila Jacobs. However,
because of a history of sexual abuse in Jacobs' home, the family's apparent nonchalant attitude
toward such abuse, (5) and the concern that Jacobs might return the children to the Kenyons, CPS
determined that such placement was not a satisfactory option.

 Section 161.001 of the Texas Family Code governs the involuntary termination of the
parent-child relationship. Pursuant to that section, a court may order termination of the parent-child
relationship if it finds by clear and convincing evidence one or more of the statutory grounds set out
in Section 161.001(1), and determines that termination is in the best interest of the child as required
by Section 161.001(2). See Tex. Fam. Code Ann. § 161.001 (Vernon 2002). Here, CPS alleged
that termination was proper under Section 161.001(1)(D) and (E). Subsection (1)(D) allows
termination where the parent knowingly places or knowingly allows the child to remain in conditions
or surroundings that endanger the physical or emotional well-being of the child. See Tex. Fam.
Code Ann. § 161.001(1)(D). Subsection (1)(E) allows termination where the parent engages in
conduct or knowingly places the child with persons who engage in conduct that endangers the
physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(E). In its
findings of fact and conclusions of law, the trial court found that termination was proper under both
Subsections 1(D) and (E). The court also found termination to be in N. K.'s and D. T. K.'s best
interests. (6)

 The evidence showed that Mrs. Kenyon not only had a substance abuse problem with, at
least, crack cocaine, but also that she would bring cocaine home to her husband while he was
watching N. K. and D. T. K. The evidence also demonstrated that Mrs. Kenyon left her children
with a sitter, and subsequently with CPS, for over four days without ample food and clothing while
she was on a drug binge. Additionally, it was shown that her community supervision had been
revoked, and she had been sentenced to ten years in prison for her drug possession and use.

 There is little evidence that Ms. Kenyon personally committed any direct physical or
emotional abuse of the children. However, the court could have found that her conduct as
summarized above jeopardized the children's well-being. In order for parental conduct to constitute
endangerment of the children's well-being, the conduct need not be directed at the children and the
children need not actually suffer injury. Rather, endanger means to expose to loss or injury, to
jeopardize. Boyd v. Tex. Dep't of Human Servs., 715 S.W.2d 711, 715 (Tex. App.-Austin 1986),
rev'd on other grounds, 727 S.W.2d 531 (Tex. 1987). Further, the specific danger to the children's
well-being need not be established as an independent proposition, but may be inferred from parental
misconduct. Id. at 533; In re King, 15 S.W.3d 272, 276-77 (Tex. App.-Texarkana 2000, pet.
denied); In re J. J., 911 S.W.2d at 440. Evidence of a parent's imprisonment may also contribute
to a finding that the parent engaged in a course of conduct that endangered the children's physical
and emotional well-being. In re Boyd, 727 S.W.2d at 534.

 Here there is evidence, not only of Mrs. Kenyon's imprisonment, but also that her conduct
placed her children in serious risk of both physical and emotional abuse. Julie Ann Ford, N. K.'s and
D. T. K.'s foster mother, testified that, at the age of two and one-half years, N. K. exhibited a fear
that  the  "[p]olice  were  after  him"  and  that  he  had  to  "[h]ide  the  drugs."  Ford  also  testified
that N. K. would pick up pieces of paper off the ground, roll them up, and ask her other children if
they wanted a "joint" to "get high." Finally, Ford testified that N. K., while having his diaper
changed, would point to his penis saying, "Suck my D-I-C-K" or gyrate his hips in an upward
thrusting motion saying, "Hump, hump, want to hump, are you going to touch me there?" (7) At the
time referenced by Ford, D. T. K. was still an infant and could not yet speak. In light of this
evidence, we cannot say that the trial court erred in finding that Mrs. Kenyon knowingly placed the
children in conditions that endangered their physical and emotional well-being. The trial court could
reasonably form a firm belief that, based on her actions as shown by this evidence as well as by
persistently engaging in illegal conduct, such as using crack cocaine, Mrs. Kenyon knowingly
engaged in conduct that endangered the physical and emotional well-being of her children.

 Furthermore, the trial court did not err in finding there was clear and convincing evidence
that  terminating  Mrs.  Kenyon's  parental  rights  was  in  the  children's  best  interests.  Although
Mrs. Kenyon has allegedly been released from prison and placed on community supervision, she is
likely to remain on community supervision for ten years, and her past conduct indicates that she had
difficulty complying with the terms of her community supervision, especially abstinence from illegal
drug use. These facts, coupled with the young age of her children, make the case for parental rights
termination quite compelling. Funtez testified that the relative youth of the boys made them more
adoptable, and because they had been in a foster home since the ages of two and one, the transition
from foster care to adoption by the foster parents would be less traumatic. (8) Moreover, according to
Ford, N. K. is extremely concerned about where he is going to "be forever," and has told her,
"Mommy, I love you, I want to stay here, I don't want to leave." (9) 

 We conclude that, based on this evidence, the trial court in this case could readily have
reached the necessary firm conviction or belief that the State's allegations were true and that the
extreme step of termination of Kenyon's parental rights was in the best interests of the children.


 We affirm the judgment of the trial court.


 William J. Cornelius*

 Justice


Date Submitted: August 29, 2002

Date Decided: February 5, 2003


*Chief Justice, Retired, Sitting by Assignment




1. The record reflects that Mrs. Kenyon had previously left one of her children unsupervised
while she slept, and the police found her eldest child, Z. K., then two years old, in the street by
himself.

2. The plan required the Kenyons to: attend parenting and anger management classes,
participate in marital counseling, attain stable employment, find and maintain adequate housing,
submit to psychological evaluations, pay child support, and submit to random drug testing.
3. The terms of Mrs. Kenyon's sentence required a hearing after 180 days of incarceration to
determine whether she should be placed on shock probation. Although the record is unclear as to
the results of this hearing, Mrs. Kenyon's appellate counsel maintains that she received shock
probation and is now living and working in Bonham, Texas.
4. This second phase was held at an unsecured facility.
5. The family apparently made no effort to keep the children away from the sexual abuser, 
Jacobs' father, when he visited and allowed the eldest boy, Z. K., to travel with him.
6. The Supreme Court of Texas has provided a nonexclusive list of factors for the fact-finder
to consider when ascertaining the best interest of a child:


 (A) the desires of the child; (B) the present and future emotional and physical needs
of the child; (C) the present and future emotional and physical danger to the child;
(D) the parenting abilities of the individuals seeking custody; (E) the programs
available to assist these individuals to promote the best interests of the child; (F) the
plans for the child by these individuals or by the agency seeking custody; (G) the
stability of the home or proposed placement; (H) the acts or omissions of the parent
that may indicate the existing parent-child relationship is not a proper one; and (I)
any excuse for the acts or omissions of the parent. 


 Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).

7. Although there appears to be no direct evidence of how or where N. K. learned these crude
sexual and drug-related phrases, the trial court was well within its discretion to reasonably infer that,
since neither N. K. nor D. T. K. spent any meaningful time outside of Mrs. Kenyon's custody, N. K.
was simply emulating the language and behaviors he witnessed at home.
8. Ford testified that she and her husband are interested in adopting both N. K. and D. T. K.
9. The need for permanence is the paramount consideration for the children's present and future
physical and emotional needs. The goal of establishing a stable, permanent home for a child is a
compelling interest of the government. In re S. H. A., 728 S.W.2d 73, 92 (Tex. App.-Dallas 1987,
writ ref'd n.r.e.). The threat of present or further incarceration makes Mrs. Kenyon's future uncertain.