# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00157-CV

**G. H., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT
### NO. 14-1297, HONORABLE GARY L. STEEL, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

A jury determined that father G.H. and mother J.O. had knowingly allowed their three daughters—Mary (5), Hailey (4), and Sally (2)—to remain in conditions or surroundings that endangered their well-being, engaged in conducted that endangered their well-being, and failed to comply with a court order establishing necessary actions to regain custody and that termination of their parental rights was in the children's best interest.[1] *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). After a lengthy jury trial, the trial court signed an order terminating G.H.'s and J.O.'s parental rights, and G.H. appealed.[2] We affirm the order of termination.

---

[1] We will refer to the children and their paternal grandmother by pseudonyms and to the children's parents by their initials. *See* Tex. R. App. P. 9.8.

[2] J.O. did not appeal from the termination of her parental rights.

## BACKGROUND[3]

G.H. and J.O. are the unmarried biological parents of the three children. The couple had been together for about six years at the time of trial. The family's involvement with the Department of Family and Protective Services began in May 2012 when the Department received a referral shortly following the birth of Hailey that both Hailey and her mother had tested positive for cocaine in the hospital. A Department caseworker, Staci Shockley, testified that during a 2012 interview, G.H. denied that he had any knowledge of J.O.'s cocaine use during the pregnancy and that he did not use any illegal drugs himself. Shockley also testified that in 2012 the parties and the children's paternal grandmother, Marcia, participated in a facilitated family team meeting to discuss J.O.'s drug use and to set up services for both parents. The participants discussed the harmful effects of drug use during pregnancy, and the Department requested G.H. to submit to drug and alcohol assessments, complete an online parenting course, and participate in individual and couple's counseling. Citing a belief that the parents were participating in the requested services, the Department closed the case a few months later.

In the fall of 2013, J.O. became pregnant with the couple's third child, Sally. G.H. testified that he had no memory of accompanying J.O. to any prenatal appointments while she was pregnant with Sally or alerting any doctors or medical professionals that J.O. had a history of using cocaine during her second pregnancy. In June 2014, J.O. was at home with G.H. and their two older children when J.O. began having contractions and gave birth to Sally before the parties could get to

---

[3] The facts in the background section are derived from the clerk's record, trial testimony, and exhibits.

a hospital. J.O. and Sally were then transported to the hospital and after routine drug screening were both found to be positive for cocaine. Sally was immediately transferred to the neonatal intensive-care unit because of the staff's concerns about seizure activity. A team of doctors treated the newborn for five days with no reported contact with G.H., and Sally was ultimately discharged into the Department's care. The Department was granted temporary managing conservatorship of all three children and placed Sally and her siblings with Marcia and her husband and began a second investigation of the parents.

Shockley testified that because she had noticed some developmental delays in the children, she recommended to Marcia that the children be assessed for therapy services. Apart from a few routine medical appointments, there was no evidence at trial that Marcia had followed up on Shockley's recommendation by the time the children were removed from her care after about six months and placed with a foster family, with whom the children have lived throughout the pendency of these proceedings. While living with the foster family, the three children began various therapies, including speech therapy for all three children, psychotherapy for the older two, and occupational therapy for the youngest. Additionally, Sally was diagnosed with Fetal Alcohol Syndrome (FAS).

The district court signed an order in August 2014 incorporating a family plan of service, with the stated permanency goal of family reunification. Among the many requirements contained within the plan of service, G.H. was required to complete protective parenting classes; complete a psychological evaluation; participate and successfully complete individual therapy and follow all of the therapist's recommendations; and provide truthful and accurate information to the Department, courts, and all service providers. About a year later, the service plan was modified to

3

include additional requirements: (1) completion of the Batterer's Intervention Program (BIPP); (2) abstention from alcohol use and submission to alcohol screens within 8 hours of requests; (3) submission to drug tests when requested; (4) completion of drug, AA/NA, and Al-Anon classes; (5) completion of couples' and family therapy with J.O.; and (6) submission to a new psychological evaluation and follow-through with its recommendations.

Shockley testified that during the second investigation, G.H. initially denied any drug use of his own and portrayed J.O. as the sole parent with a drug problem. However, in a psychological evaluation he underwent in September 2014, G.H. admitted to having an extensive history of drug abuse, including using cocaine several times a week for a ten-year period, and having been arrested for DWI as both a juvenile and adult and having multiple arrests for public intoxication. G.H.'s psychological evaluation indicated that he "has a high probability of having a Substance Use Disorder" and has "Bipolar Disorder, Manic, Severe, Without psychotic features."

G.H. testified that he used cocaine with J.O. on multiple occasions during their six-year relationship and that he continued to use cocaine three to four times a year individually apart from J.O. He testified that J.O.'s cocaine "binges" could be extreme and that any "genius" could recognize signs of drug use but that he was not aware that J.O. had used any illegal drugs during her pregnancies and had not used any cocaine with her during her pregnancies, and that he had last used cocaine within a month of Sally's birth.

The children had been living with the foster parents for about a year at the time of trial, and their foster mother testified that she and her husband would be seeking to adopt the children if G.H.'s and J.O.'s parental rights were terminated.

4

**DISCUSSION**

G.H. asserts that the evidence is legally and factually insufficient to support the jury's findings that (1) termination was in the children's best interest and (2) he committed conduct constituting any of the three alleged statutory grounds for termination. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). In conducting a factual-sufficiency review, we view the entire record and will uphold a finding unless "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the Department's allegations are true. *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In conducting a legal-sufficiency review, we consider "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *J.F.C.*, 96 S.W.3d at 266).

We will first review the sufficiency of the evidence supporting the jury's finding under subsection (b)(1)(O) that G.H. "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child." Tex. Fam. Code § 161.001(b)(1)(O). Department caseworker Shockley testified that G.H. did not complete all of the services outlined in the court-ordered family service plan.[4] Specifically, she

---

[4] G.H. contends that a July 2015 "amended" service plan "superseded" the previously filed original plan of August 2014, *see* Tex. Fam. Code § 263.104(a), (b) (providing that service plan "may be amended at any time" and that "amended service plan supersedes the previously filed service plan"), and that the "original plan" was, therefore, "defunct" at the time of trial, and G.H.'s failure to comply with the requirements in the "original plan" may not constitute evidence of his

testified that G.H. had not: submit[ted] to all requested alcohol testing; completed BIPP; submitted to all random drug screens; completed couples' and family therapy with J.O.; nor completed drug, AA/NA, and Al-Anon classes. Shockley testified that the Department requested drug and alcohol tests for G.H. on November 9 and December 8, 2015 and a drug test on June 10, 2015, but that he never completed those tests.

Shockley further testified that she never received any documentation from G.H. or the service provider to verify completion of the couples' or family counseling or of his attendance at the drug, AA/NA, and Al-Anon classes.[5] The BIPP requirement was added to the service plan by court order on July 23, 2015. However, Sherry Murphy with the Family Crisis Center testified that G.H. did not submit to an assessment at the center until October 20, 2015, whereupon the center recommended that he participate in a 28-week program. Murphy testified that each participant is allowed to miss up to five classes, needing to attend only 23 classes to complete the program.

noncompliance. However, the court's July 2015 order, in addition to ordering several modifications to the service plan (such as the BIPP requirement), specifically stated that "all previous orders issued by this Court shall continue in full force and effect" and that "the plan of service for the parents previously filed with the Court or attached to this order and incorporated herein by reference as if the same were copied verbatim in this order, is APPROVED and made an ORDER of the Court." Accordingly, there is no merit to G.H.'s argument about section 263.104(b), and our references to the "service plan" include all iterations of the service plan, including the original August 2014 plan and the July 2015 court-ordered modifications to the plan.

[5] At trial, the court admitted into evidence a letter offered by G.H. from a couples' therapist listing thirteen sessions that G.H. and J.O. had attended together and noting the date when "couples' therapy sessions terminated" (for reasons unexplained) as well as a certificate noting that G.H. had "completed 12 hours of Chemical Dependency Training" conducted by the Alcohol Treatment Series (A.C.T.S.). G.H. has cited no evidence indicating that he had attended AA/NA or Al-Anon classes.

Murphy testified that at the time of trial, G.H. had completed only seven individual classes and used four of his absences.[6]

Based on our review of the entire record, we conclude that the evidence is legally and factually sufficient to support termination of G.H.'s parental rights under subsection (b)(1)(O) for his failure to comply with all requirements of the court-ordered family service plan. *See id.*; *In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.) (holding that substantial compliance or completion with service plan is not enough to avoid termination finding under subsection (b)(1)(O), which also does not "make a provision for excuses" for noncompliance). Accordingly, we will not summarize the evidence supporting the other two statutory grounds challenged by G.H. on appeal, although we note that our review of the record leads us to conclude that the jury's findings under subsections (b)(1)(D) and (E) pertaining to child endangerment are supported as well. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (holding that sufficient proof of one statutory termination ground, in tandem with finding that termination is in best interests of children, is sufficient to support termination order); Tex. R. App. P. 47.1 (requiring court of appeals to hand down written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of appeal).

We next consider whether the evidence is sufficient to support the jury's finding that termination of G.H.'s parental rights was in the children's best interest. The jury instructions

---

[6] On cross-examination, Murphy testified that the center received a referral from the Department on September 28, 2015. On appeal, G.H. contends that based on this timeline, it would have been impossible to complete the entire 28-week class by the time of trial beginning on January 20, 2016. However, both Murphy and Shockley testified that a referral is not necessary from the Department and that an individual is free to contact the center and set up an intake interview on his own, which G.H. failed to do.

7

listed the *Holley* factors as "[s]ome, but not all, factors to be considered" in this determination. *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (providing list of factors to consider when evaluating best interest: child's wishes, emotional and physical needs of child, emotional and physical danger to child, parenting abilities of individuals seeking custody, programs available to assist those individuals, competing plans for child, stability of home, parent's actions shedding light on parent-child relationship, and any excuses for parent's actions). The Department is not required to prove all nine factors, *see In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002), and a best-interest analysis may be based not only on direct evidence but also on circumstantial evidence, subjective factors, and the totality of the evidence as a whole. *See In re S.H.A.*, 728 S.W.2d 73, 86 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). Evidence supporting the statutory grounds for termination is also probative of best interest. *C.H.*, 89 S.W.3d at 28.

Several witnesses testified about the children's extensive ongoing medical and therapeutic needs, including speech, individual, and occupational therapy that the children would need to continue until they were developmentally on target. Rather than accept the diagnoses and recommendations by the professionals who testified at trial, G.H. testified that he distrusted the experts and that, if his children were returned to him, he would "definitely be taking all of them to the doctor so we can see if there really is anything wrong" and if "any of this stuff that [the Department has] made up through the case is true." Shockley testified that while the children were living with Marcia, G.H. had unlimited access to visit with his children as long as the visits were supervised by Marcia. Marcia testified that during this approximately six-month period of unlimited visitation rights for G.H., he "came about three times [a week] and stayed for about an hour [each time]."

Shockley testified that she was concerned that the children's parents would not "be able to take the girls to their multiple appointments," and that "[Sally] alone is probably going to need at least three days a week of occupational therapy, and that doesn't even include the speech therapy or the follow-ups for fetal alcohol syndrome" and that both Mary and Hailey have ongoing appointments for speech and individual therapy. She testified that she had no concerns about the foster parents' ability to provide "a safe and stable home" for the children and that the Department intended to begin the adoption process with the foster family if the Department was awarded permanent managing conservatorship of the children.

Shockley summarized the reasons she believed that the children should not be returned to their parents: the parents put their own needs before their children's; the children need a safe and stable home without the presence of criminal activity and exposure to drugs; the children have significant developmental delays, needs, and medical and therapy appointments that the parents are likely unable to adequately address; and due to the parents' drug abuse, the children would face a higher risk of exposure to various types of abuse. She testified that adoption by the foster family would be in the children's best interest.

G.H. testified that he had never provided health insurance for the children previously, that he did not have any health insurance set up for them if they were returned to him, and that he would "have to look into it." He testified that he and J.O. were going to give their "rocky" relationship "one more shot."[7] He testified that he did not learn how to change a diaper until some time after the children had been moved from his mother's home to the foster home and that J.O. had

---

[7] Evidence supported at least one incident of domestic violence between the parents and G.H.'s tendency to be controlling of J.O.

been the "hands-on" parent. He testified that for "these 18 months that I've been in this case, I have not used drugs," despite his own admission later on cross-examination to testing positive for cocaine twice during the pendency of the case. One of those times he admittedly re-tested himself and "barely failed" after the Department's test indicated that he tested at "53 times the normal cutoff limit [indicating] cocaine usage."

G.H.'s individual therapist, Renese Johnson, testified that when she first began working with G.H. in September 2014, he told her that he did not know how to change a diaper, and she talked with him about the importance of "spending more time practicing with the kids." She testified that it would be concerning to her if G.H. only spent three hours a week with his children during the six-month period when he had unlimited access to the children while they were living with Marcia, depending on the circumstances and the reasons for the minimal time spent with the children.

The children's psychologist, Paul Johnson, testified that he would have concerns about their safety if their parents continued to abuse drugs while the case was pending.[8] He also testified that he believed the children tended to distrust adults and that their distrust had resulted from poor supervision and limit-setting by their parents, who he believed are "lacking" in being "present and monitoring what—where the kids are and what they're up to."

The court-appointed special advocate (CASA) for the children, Dianna Price, testified that she believed it would be in their best interest to remain with their foster family and that she would have concerns about their emotional and physical safety and that they would not receive the care, stability, and medical attention they need if they were returned to their parents. She further

---

[8] Evidence showed that both parents continued to use drugs during the pendency of the case.

testified about her observation at visitations that G.H. is not a "hands-on" parent and that J.O. is the "only provider in regards to the girls there—to meet their emotional, mental and physical [needs]." Price expressed concern about G.H.'s failure to be "open and honest with the Department or CASA" during the pendency of the case. Price testified that although the children are "extremely bonded to and love their parents," they are also "extremely bonded to" the foster parents and that she believed the children should stay with the foster family even if it meant no further contact with their parents.

The foster mother testified that at the beginning of the case she was hopeful that the children would be able to return to their parents but that she later decided to intervene in the case because of her observations of the children's behavior and of their visits with G.H. and because of "the things that [the children have] told me."[9] She testified that as the children have become more comfortable with her, they have begun "telling [her] more about their past" and had begun calling her and her husband "Mommy" and "Daddy." She also testified that she observed a visitation that G.H. had with his children at which G.H. became very angry and raised his voice about a mess associated with changing Sally's diaper and the refusal of Department and other persons present to help him with the task.

From all of this evidence, the jury could reasonably have concluded that G.H. is unable or unwilling to provide for his children's emotional and physical needs and to provide a stable environment for them, and that their needs would best be met by the foster parents, who desire to adopt the children. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (noting that factfinder may consider parent's inability to provide adequate care for child, lack of

---

[9] The trial court sustained the parents' hearsay objections about what the children had told the foster mother.

11

parenting skills, and poor judgment when looking at child's best interests).  The jury could also have reasonably given "great weight" to the "significant factor" of G.H.'s drug-related conduct, *see Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ); *see also May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied) (noting that evidence of past misconduct or neglect is permissible as inference that parent's future conduct may be measured by past conduct), and considered G.H.'s intention to continue to closely associate with J.O. as a choice to allow endangering persons to be around his children and potentially create a volatile and unstable environment for the children, based on evidence that the couple had some history of domestic violence and use of illegal drugs together.

We conclude that the entirety of the evidence allowed the jury to form a firm belief or conviction that termination of G.H.'s parental rights is in the children's best interest.  We overrule G.H.'s issues on appeal.

## CONCLUSION

Having overruled G.H.'s issues on appeal, we affirm the trial court's termination decree.

_____

David Puryear, Justice

Before Chief Justice Rose, Justices Puryear and Pemberton

Affirmed

Filed:   August 17, 2016

12